UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| POOLRE INSURANCE CORP., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-13-1857 |
| | § | |
| ORGANIZATIONAL STRATEGIES, INC., *et al.*, | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court are the following: (1) plaintiff PoolRe Insurance Corp.'s ("PoolRe")[1] second amended petition, motion to confirm arbitration award ("motion to confirm"), and motion to compel arbitration ("motion to compel") (Dkt. 6); (2) defendants Organizational Strategies, Inc. ("OSI"), Nicolette Hendricks, and William Hendricks's (collectively, "defendants" or "OSI parties") opposition to the motion to compel (Dkt. 9); and (3) defendants' motion for a temporary restraining order ("TRO motion"). Dkt. 10.

The court has carefully reviewed the pleadings, briefing, exhibits, and applicable law. Plaintiff's motion to compel (Dkt. 6) is **DENIED**; any and all arbitration proceedings related to the second arbitration[2] are immediately **STAYED** pending further order of this court; proceedings related to plaintiff's motion to confirm (Dkt. 6) are **STAYED** pending Judge Andrews's decision on the motion to compel arbitration; and the TRO motion (Dkt. 10) is **DENIED AS MOOT**.

---

[1] Plaintiff purportedly filed this case on its own behalf and that of The Feldman Law Firm LLP (the "Firm") and its affiliated entities Capstone Associated Services, Ltd., Capstone Associated Services (Nevada), LP n/k/a Capstone Associated Services (Wyoming), LP, and Capstone Insurance Management, Ltd. (collectively, "Capstone"). Dkt. 6 (second amended petition) at 1. Unless otherwise noted, the court's references to the "plaintiff" or the "Capstone entities" include the named plaintiff PoolRe, Capstone, and the Firm.

[2] The "second arbitration," as referenced throughout this order, is the "Remaining Arbitration" proceeding described in plaintiff's second amended petition, namely the proceeding styled "'Capstone Associated Services, Ltd., Capstone Associated Services (Nevada), LP n/k/a Capstone Associated Services (Wyoming), LP, and Capstone Insurance Management (Anguilla), Ltd. (a/k/a Capstone Insurance Management, Ltd.) (collectively, "Capstone") and PoolRe Insurance Corp. v. Organizational Strategies, Inc., Nicolette Hendricks, William Hendricks' and those in privity with any of the aforementioned arbitration respondents." *See* Dkt. 6 at 7–8 ¶ 16 (footnote omitted).

## I. BACKGROUND

This contract dispute regarding captive insurance companies[3] is now before two federal district courts and is the subject of two arbitral proceedings. Nevertheless, the court will provide a brief summary of the relevant facts that have already been presented to the respective tribunals, beginning with an identification of the parties to the relevant disputes.[4]

### A. *Factual Background*

Capstone is a series of related companies that provide turnkey formation and administration of captive insurance companies. *See* De. Case Dkt. 6, Ex. E (Capstone's first arbitration demand) at 1–2. Capstone administers PoolRe, a third party insurer engaged in providing pooling insurance services, on behalf of its officers, directors, and owners, *id.* at 2, and the Firm provides legal services related to Capstone's support for the captive insurance companies. *Id.* at 1 n.2.[5] Nicollete and William Hendricks manage OSI, a professional services firm that provides classified programming and systems work for the United States Department of Defense. *Id.* at 1.

In April 2011, the OSI parties sought advice from the Firm regarding captive insurance planning options. *See* De. Case Dkt. 6, Ex. G (planning memorandum) at 1. On April 25, 2011,

---

[3] A "captive insurance company" is "organized for the purpose of insuring the liabilities of its owner." *Westchester Fire Ins. v. Heddington Ins. Ltd.*, 883 F. Supp. 158, 160 n.4 (S.D. Tex. 1995) (Hittner, J.) (quoting *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1298 n.1 (9th Cir. 1987)). In *Westchester*, Heddington Insurance Ltd. was Texaco's captive insurer, and the named insureds under the policy at issue were Texaco and its subsidiaries. *Id.*

[4] In addition to summarizing the facts in the record of this proceeding, the court will also refer to the facts as presented within the related case now pending before Judge Richard Andrews of the United States District Court for the District of Delaware. *See Organizational Strategies Inc. et al. v. The Feldman Law Firm LLP et al.*, No. 1:13-cv-764-RGA (D. Del. removed May 2, 2013) (hereinafter the "Delaware Case" or the "De. Case"). The court takes judicial notice of the pending judicial proceedings and public documents filed in Judge Andrews's related case. *See Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 246 n.3 (5th Cir. 1997).

[5] According to the Firm's engagement letter with the OSI parties, the Firm is associated with Capstone, "which is owned by certain of the Firm's lawyers and related parties," in order "to provide many of the needed support services." De. Case Dkt. 6, Ex. F (June 20, 2011 engagement letter) at 2.

Stewart Feldman, the named partner of the Firm, sent a planning memo to the OSI parties, outlining the process for the provision of services and describing the need for a feasibility study "addressing the application of alternative risk/captive planning to your operating entities." *Id.* After an on-site visit to OSI, the Firm sent an engagement letter to the OSI parties on June 20, 2011 for the "formation and administration of a captive insurance program." De. Case Dkt. 6, Ex. F at 1. This multi-year agreement contemplated the formation of two to three captive insurance companies under section 831(b) of the Internal Revenue Code. *Id.* Further, the parties to the agreement understood that these companies would underwrite alternative risk programs for the benefit of the OSI parties to protect them against loss exposures beyond those covered by other commercial insurance carriers. *Id.* at 1–2. The letter noted that this protection was "especially critical given the niche industry in which OSI operates." *Id.* at 2. As a defense contractor with more than 200 staff personnel, OSI maintains field offices across the United States specializing in applied technology and services. *Id.*

Both the planning memo and the engagement letter contain identical attachments regarding client information and billing guidelines. *See* De. Case Dkt. 6, Ex. F at 14–16; *id.*, Ex. G at 7. Within the guidelines, the parties agreed to a broad arbitration provision, including a clause specifying that an arbitrator, not a court, would hear "any and all . . . disputes or claims whatsoever between us related to or arising out of our services (but in no event for attorneys' fees and/or costs) . . . ." *See, e.g.*, De. Case Dkt. 6, Ex. G at 7 (hereinafter referred to as the "disputes clause"). And after that clause, the arbitration provision contained a delegation of authority to decide gateway and substantive questions of arbitrability to the arbitrator: "All arbitration . . . shall be conducted pursuant to the Commercial Arbitration Rules of the AAA . . . [and] . . . the issue of arbitrability shall . . . be decided by the arbitrator, and not by any other person. That is, the question of whether

a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court. . . ." *Id.* (hereinafter referred to as the "delegation clause").

The engagement letter also included an Exhibit B, the Capstone Services Agreement (the "services agreement"), which was to be entered among the Capstone entities, the OSI parties, and the three captive companies, namely Optimal Casualty Corp., Systems Casualty Corp., and Integration Casualty Corp. (the "captives"). De. Case Dkt. 6, Ex. B to Ex. F at 1. The parties agreed that the services agreement would become effective at a subsequent date upon the "issuance of the insurance licenses for each of the [captives]." *Id.* Although the parties' briefing does not mention the precise issuance date, neither party disputes the services agreement's validity. In fact, Capstone's second arbitration demand invokes the protections of the services agreement and seeks relief against the OSI parties for allegedly disclosing Capstone's intellectual property in violation of Article V of that agreement. *See* Dkt. 10, Ex. A (second arbitration demand) at 2 (captioned as "Claimant Capstone's New Demand for Arbitration Regarding Violation of Capstone Services Agreement Article V (Information Disclosure and License)"). Further, Article VI of the services agreement contains a venue clause specifying that "[f]or purposes of any disputes arising under Article V of this Agreement, the sole venue and jurisdiction for resolution of such disputes *shall be courts* located in Harris County, Texas." *See id.*, Ex. B at 9 art. 6.4 (emphasis added). Article VI does not specifically refer to the prior broad arbitration clauses contained in the billing guidelines of the Firm, but Article 6.1 provides: "To the extent of any conflict between the terms and provisions of this Agreement and the Engagement Letter, this Agreement exclusively shall control." *Id.* at 9 art. 6.1; *accord id.* at 2 art. III ("Any conflict between this Agreement and the Engagement Letter shall be construed in a manner giving precedence to this Agreement in all cases whatsoever."); Dkt. 10, Ex. C (Capstone's

4

reply on its motion to compel in the Delaware Case) at 7 (describing the relationship between the guidelines' and services agreement's forum provisions and admitting that "[t]he first sentence of the venue clause merely carves out an exception that intellectual property disputes *must* be resolved in courts located in Harris County, Texas") (emphasis added).

From June 2011 through early 2012, Capstone provided its services under the engagement letter to the OSI parties without any apparent material disputes. De. Case Dkt. 6, Ex. E at 2. However, in 2012, a disagreement arose when OSI's retained accounting firm, Watkins Meegan, performed its annual audit and prepared OSI's tax return. *Id.* As a result of Watkins Meegan's work, OSI requested in mid-2012 that Capstone alter certain accounting information for 2011 involving PoolRe and the three captives. *Id.* Capstone resisted the request, claiming that it could not justify the alterations. *Id.*

After continued discussions throughout 2012 failed to achieve a resolution, PoolRe cancelled its agreements with the captives and returned the total deposit of retention premiums. *Id.* OSI subsequently claimed that it had not received the refund checks, and PoolRe began a process of tendering the disputed funds to an escrow account in Anguilla, PoolRe's domicile.[6] Further, in December 2012, after consulting with ethics counsel, the Firm withdrew from further work for the OSI parties until the dispute was resolved. *Id.* at 3. On February 26, 2013, the OSI parties sent a letter to Capstone, which the latter contends effectively blocked Capstone from providing further services to the OSI parties under the engagement letter. *Id.*; *see also* De. Case Dkt. 6, Ex. H.

---

[6] Anguilla is a Caribbean island and a member of the British Overseas Territories. *Koehler v. Bank of Berm. (N.Y.) Ltd.*, 229 F.3d 187, 187 n.1 (2d Cir. 2000) (Sotomayor, Circ. J., dissenting from den. of reh'g en banc). Other members include the Cayman Islands, Bermuda, and the British Virgin Islands. *Id.*

*B. Procedural Background*

Capstone filed an arbitration demand (the "first arbitration") against the OSI parties on March 12, 2013. De. Case Dkt. 6, Ex. E at 1. Capstone stated that its claim arose "out of a breach of contract in which the [OSI parties] made further performance by [Capstone] impossible." *Id.* at 1. Capstone forwarded its demand to Dion Ramos ("Ramos")[7] of Conflict Resolution Systems, PLLC ("CRS") in Houston, Texas on Friday, March 15, 2013, and requested that he appoint an arbitrator and set a scheduling order.[8] Dkt. 6, Ex. 7 (email string) at 3. On Monday, March 18, 2013, Ramos appointed himself as the arbitrator of the first arbitration pursuant to CRS procedures. *Id.* at 2–3.

On March 29, 2013, the director of the Anguilla Financial Services Commission, Keith Bell, sent a letter to "PoolRe Property & Casualty Insurance Corporation, c/o Capstone Insurance Management (Anguilla), Ltd." located in The Valley, Anguilla, to Stewart Feldman's attention. Dkt. 6, Ex. 6. The letter related to PoolRe's dispute with the captives, for which PoolRe was seeking arbitration under clauses that specified as follows:

> The ICC Rules of Arbitration shall control except with respect to the selection of the arbitration panel, which shall consist of one qualified, independent arbitrator selected by the Anguilla, B.W.I. [British West Indies] Director of Insurance. . . . The Arbitration Proceeding shall take place in the Territory of Anguilla, B.W.I.

Dkt. 6 at 5 ¶ 11 (quoting the arbitration provision in three stop loss endorsements between PoolRe and each captive). Bell notified Stewart Feldman that he understood that certain arbitration provisions in insurance agreements designated "the Anguilla, B.W.I. Director of Insurance" to select an independent arbitrator for dispute resolution. Dkt. 6, Ex. 6 (letter from director Keith Bell) at 1.

---

[7] Ramos is a former civil district court judge of the 55th Judicial District Court of Harris County, Texas.

[8] Capstone's arbitration demand was emailed to the arbitrator by a senior counsel of RSL Funding, LLC, a non-party to the arbitration proceeding and both of the federal district court proceedings. Dkt. 6, Ex. 7 at 3–4. RSL Funding's senior counsel identified himself as Capstone's "attorney of record in this arbitration." *Id.* at 3.

6

Bell further explained that while there was no such official in Anguilla, he designated Ramos and CRS as the independent arbitrators and administrators of the arbitration proceedings. *Id.* at 1–2. He also directed that further contact should be made with Ramos at his Houston address. *Id.*

PoolRe and the Firm then intervened in the initial arbitration, and the parties began discovery in April 2013. *See* Dkt. 6 at 6 ¶ 13; De. Case Dkt. 6, Ex. A (the Firm's intervention demand) at 1. Ramos held a series of oral hearings, and OSI filed a motion to dismiss on grounds that the arbitration clauses were not binding. *See* Dkt. 6 at 6 ¶ 13; Dkt. 6, Ex. 8 (order on motion to dismiss) at 1. On May 1, 2013, Ramos denied OSI's motion to dismiss, stating in relevant part:

> [OSI] argues that the Capstone Services Agreement controls. The Arbitrator finds the Claimant's [Capstone] Arbitration Demand claims violations by the Respondents of the lawfirm's engagement agreement and the Capstone Services Agreement. Clearly the lawfirm's actions under the engagement letter are subject to the Arbitration clause. . . . The Arbitrator finds that the written agreements between the parties have a valid Arbitration clause which requires all parties to Arbitrate their claims rather than seeking relief in courts.

*Id.*

Meanwhile, as the first arbitration continued, the OSI parties filed suit in the Delaware Court of Chancery in late April 2013, asserting claims against the Capstone entities for professional negligence, malpractice, fraud in the inducement, and breach of contract. De. Case Dkt. 6, Ex. J (email string) at 2. Vice Chancellor Sam Glasscock, III of the chancery court issued a *status quo* order on May 1 and set a hearing on the application for a temporary restraining order ("TRO") on May 6, which, if granted, would have stayed the first arbitration. Dkt. 7 at 4 ¶ 12. But before the TRO hearing, Capstone removed the case to the United States District Court for the District of Delaware on May 2. De. Case Dkt. 1 (notice of removal).

Upon removal the Delaware Case was assigned to Judge Richard G. Andrews. Dkt. 7 at 4 ¶ 12. On May 24, 2013, Judge Andrews denied the TRO request, vacated the *status quo* order, and held Capstone's motion to dismiss and motion to compel in abeyance for further briefing. *Id.* These motions remain pending before Judge Andrews. *Id.* Notably, as discussed in Part II.C, *infra*, a critical issue in the motion to compel arbitration is whether, and if so, to what extent, the services agreement supersedes the prior arbitration provisions. *See* Dkt. 10, Ex. C at 2 (Capstone's discussion in its reply brief regarding the argument over whether "a subsequent agreement, the [services agreement], negated the parties' original arbitration agreement").

And as the parties continued briefing the motion to compel in Delaware, the first arbitration proceeded through discovery and pre-hearing activities in May and June 2013. On Sunday, June 23, three days before the first arbitration hearing was set to begin in Houston on June 26, Capstone filed a second arbitration demand alleging that the OSI parties breached Article V of the services agreement. Dkt. 10, Ex. A at 2. The following day, on Monday, June 24, Capstone and PoolRe filed a notice purportedly withdrawing the second arbitration demand because they "incorrectly failed to note that their May 2013 pleading identified misuse and dissemination of confidential and proprietary information and trade secrets in violation of the parties' contractual agreements as one of their claims. Yesterday, [the Capstone entities] incorrectly filed this as a new claim and incorrectly stated that such was not a claim in the pending arbitration." Dkt. 9, Ex. A (Claimants/Intervenors' Correction) at 1–2. When the hearing began two days later on Wednesday, June 26, Ramos deferred consideration of the second arbitration demand, concluding: "I think I have to treat that as a new claim for arbitration that was filed on Sunday. So it won't be part of this case."

*See* Dkt. 9, Ex. B (Arb. Hr'g Tr., June 26, 2013) at 5:6–8.  The first arbitration hearing concluded the following day on Thursday, June 27, 2013.  Dkt. 6, Ex. 9 (arbitration award) at 1.

Back on the judicial front, as the parties were preparing for the June 26 arbitration hearing, plaintiff filed a pleading seeking to confirm an arbitration award in the instant case, in which plaintiff applied "to this Court for an order confirming a forthcoming arbitration award."  Dkt. 1 (confirmation motion) at 1.  Recognizing the unusual step of a litigant seeking confirmation of an award that had not yet been entered, the court issued a show cause order on June 27 and ordered the plaintiff to demonstrate why the court should not dismiss the case for want of jurisdiction under the Federal Arbitration Act.  *See* Dkt. 4 (order to show cause) at 1; 9 U.S.C. § 9 (providing jurisdiction for the court to confirm an arbitration award "at any time within one year *after* the award is made") (emphasis added).  The court ordered plaintiff to respond no later than July 9, 2013.  Dkt. 4 at 1.

On the evening of July 9, plaintiff timely filed its response (Dkt. 5) and filed a second amended petition (Dkt. 6) in which plaintiff informed the court that "[t]he arbitrator issued an Arbitration Award concerning all of the matters that were the subject of the first arbitration on July 9, 2013."  *See* Dkt. 6 at 7 ¶ 14.[9]  The second amended petition restated plaintiff's original motion to confirm the arbitration award that, as expected, was rendered in plaintiff's favor, and the pleading also moved for the court to compel the defendants to the second arbitration, which was already underway before Ramos.  On July 11, the summons were issued, and the defendants filed their answer to plaintiff's second amended petition on July 23, 2013.  On the same day, the defendants filed a brief in opposition to the motion to compel arbitration (Dkt. 9) and a motion for a TRO to stay the second arbitration.  Dkt. 10.

---

[9] For the sake of precision, the court notes that plaintiff filed its response at 11:26 p.m. (CDT) on July 9, and then filed its second amended petition at 1:06 a.m. (CDT) on July 10, 2013.  Dkts. 5–6.

## II. ANALYSIS

Plaintiff's second amended petition seeks two measures of relief: (1) an order compelling the OSI parties to participate in the second arbitration; and (2) confirmation of the award entered after the first arbitration. Dkt. 6. As discussed further below, plaintiff's first request will be denied because the claims in the second arbitration are not arbitrable and must be heard in a court located in Harris County, Texas, and consideration of plaintiff's motion to confirm is premature while the issues surrounding the validity of the arbitration agreements remain before Judge Andrews in the Delaware Case.

### A. *The Motion to Compel*

First, Plaintiff contends that the court should compel the OSI parties to participate in the second arbitration pursuant to the relevant arbitration agreements. Dkt. 6 at 7–9 ¶¶ 16–18. The OSI parties respond that the second arbitration's claims for relief arise under Article V of the services agreement and are not arbitrable, as a separate provision of the services agreement provides for resolution of Article V claims in "courts located in Harris County, Texas." Dkt. 9 (OSI parties' response) at 2–5; Dkt. 10, Ex. B at 9 art. 6.4. This court agrees with the OSI parties and holds that the venue clause of Article VI of the services agreement supersedes the broad arbitration provisions of the billing guidelines insofar as they relate to claims for relief under Article V of the services agreement. Accordingly, the claims raised in the second arbitration are not arbitrable and, pursuant to the parties' explicit venue clause, those claims must be heard in a court located in Harris County, Texas. After reviewing the relevant background law for motions to compel arbitration, the court explains its reasoning below.

Under section 4 of the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Section 4's repeated references to the agreement make it clear that a court will often be called upon to decide whether the parties executed a valid arbitration agreement before compelling arbitration of the dispute. *Jolley v. Welch*, 904 F.2d 988, 994 (5th Cir. 1990); *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778 (2010) ("If a party challenges the validity under [FAA] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4."). Although movants in these circumstances often tout the strong federal policy favoring arbitration, that policy does not come into play during the initial determination of validity. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). It arises in step two of the analysis, when the court determines the scope of a valid arbitration agreement through a favorable lens and resolves ambiguities in favor of arbitration. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073–74 (5th Cir. 2002). But when the agreement "obviously excludes" particular claims from its coverage, those exclusions must be given effect to respect the parties' intent. *Local Union No. 4–449, Oil Chem. & Atomic Workers Union v. Amoco Chem. Corp.*, 589 F.2d 162, 163 (5th Cir. 1979) (per curiam). Arbitration is a matter of consent and a method "to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920 (1995).

Moreover, in evaluating the threshold issue of arbitrability, the Supreme Court has stated: "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and

11

unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588 (2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S. Ct. 1415 (1986)). In other words, unlike most issues that the FAA leaves to the arbitrator, the parties must "clearly and unmistakably" intend for the arbitrator to answer the gateway question of arbitrability. *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). Otherwise, arbitrability is presumptively an issue for the court to decide. *Id.* "In this manner the law treats *silence or ambiguity* about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption." *First Options*, 514 U.S. at 944–45 (first emphasis added); *cf. Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S. Ct. 927 (1983) ("[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

The court is thus presented with two questions in evaluating the motion to compel: (1) who—whether this court or an arbitrator—makes the gateway decision of arbitrability of the dispute; and (2) if the court finds under federal law that it has the power to decide that question, whether the claims asserted in the second arbitration are arbitrable.

### 1. Who Determines Arbitrability?

As discussed above, the default rule regarding who decides arbitrability is the court, not the arbitrator, "'[u]nless the parties clearly and unmistakably provide otherwise.'" *Petrofac*, 687 F.3d at 675 (quoting *AT&T Techs.*, 475 U.S. at 649). In *Petrofac*, the Fifth Circuit addressed a situation in which the parties incorporated the Rules of the American Arbitration Association ("AAA") into their arbitration agreement. *Id.* Under AAA Rules, "[t]he arbitrator shall have the power to rule on

12

his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* The court found that the express adoption of these rules provided "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.*

Like *Petrofac*, the delegation clause in this case contains clear and unmistakable evidence of a delegation of authority to the arbitrator regarding the question of arbitrability. *See, e.g.*, De. Case Dkt. 6, Ex. F at 16 (incorporating the "Commercial Arbitration Rules of the AAA" and purporting to "divest the courts of all powers in disputes involving the parties"). If the delegation clause was the last word on arbitrability, the court's analysis would likely be complete. But this case presents a different reality. The parties before the court executed a subsequent agreement, the services agreement, in which they appeared to depart from the broad grant of arbitrability in prior provisions. Unlike *Petrofac*, in which the parties clearly expressed their intent in a single agreement, the court must consider the interaction of multiple agreements in assessing whether there is "clear and unmistakable evidence" regarding the question of "who determines arbitrability" in this case.

The court recognizes that Article VI of the services agreement is silent with regard to whether the court or arbitrator should determine the arbitrability of disputes arising under Article V or elsewhere in the agreement. What appears clear, though, is that the parties intended to entrust disputes arising under Article V to a judicial forum in Harris County, Texas. *See* Dkt. 10, Ex. B at 9 art. 6.4 ("For purposes of any disputes arising under Article V of this Agreement, the sole venue and jurisdiction for resolution of such disputes shall be courts located in Harris County, Texas"); Dkt. 10, Ex. C at 7 (Capstone's concession on this point in its reply in support of its motion to compel pending in the Delaware Case). The key inquiry thus becomes whether the services agreement clearly and unmistakably demonstrates an intent to retain the arbitrator as the decision-maker regarding gateway questions of arbitrability.

13

There is an argument that the parties' silence in the services agreement should be construed as an implicit affirmance that all arbitral evaluations, including gateway questions, should remain with the arbitrator. However, there is an equally compelling argument that Article VI's anti-arbitration language, particularly regarding the parties' desire to have certain disputes heard by a court of law when resort to such a forum was previously prohibited, demonstrates that the parties revoked the delegation clause. At the very least, the existence of this dispute indicates that the parties' intent is ambiguous, thereby precluding a finding that the services agreement "clearly and unmistakably" reaffirms the delegation clause. *Cf. First Options*, 514 U.S. at 945 (stating that courts hesitate to find that, in the face of silence or ambiguity, the parties gave the arbitrator the power to make the traditional judicial determination "on the 'who should decide arbitrability' point"). Accordingly, the court holds that because the parties' intent in the services agreement regarding who determines arbitrability is not clear and unmistakable, the delegation clause will not be given effect under federal law, and the default rule of judicial construction applies.

### 2. Are the Claims in the Second Arbitration Arbitrable?

The court now turns to an evaluation of whether and if so, how, the services agreement revokes or modifies the disputes clause of the engagement letter. For purposes of its analysis the court assumes, without deciding, that the disputes clause has not been revoked in its entirety. Instead, the court turns to the second step of analysis, the determination of whether the claims raised in the second arbitration are within the scope of the parties' arbitration agreements.

As alluded to above, the claims in the second arbitration, which arise under Article V of the services agreement, appear to fall within the auspices of the venue clause of Article VI. That clause states that the sole venue and jurisdiction of Article V disputes regarding intellectual property "shall be courts located in Harris County, Texas." Dkt. 10, Ex. B at 9 art. 6.4. Language in the engagement

14

letter's billing guidelines is broader than the venue clause, but the services agreement provides that "[t]o the extent of any conflict between the terms and provisions of [the services agreement] and the Engagement Letter, [the services agreement] exclusively shall control." *Id.* at 9 art. 6.1.

Under Texas law,[10] the court will construe these provisions and enforce them according to their plain meaning unless to do so would defeat the intentions of the parties. *See Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 590 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The court has carefully considered the relevant agreements and agrees with the OSI parties' position in this case, and Capstone's position in the Delaware Case, that the parties intended to carve out disputes under Article V from the broad grant of arbitrability in the previous agreements among the parties.[11] The claims in the second arbitration arise under Article V, *see* Dkt. 10, Ex. A, and thus they are plainly not arbitrable. *See Amoco*, 589 F.2d at 163 (holding that the federal court's policy favoring arbitration is displaced by the parties' clear exclusions of arbitrability). Plaintiff's motion to compel (Dkt. 6) is **DENIED**.

*B. Staying the Second Arbitration*

In an ordinary case, the denial of a motion to compel arbitration upon a finding of non-arbitrability would logically preclude initiation of arbitral proceedings. But this case is far from ordinary. The OSI parties have presented documentary evidence that the Capstone entities are currently proceeding with the second arbitration on an expedited schedule, requesting short response deadlines for document production. *See* Dkt. 10, Ex. D at 2–3 (email dated July 22, 2013 from

---

[10] The services agreement contains a Texas choice-of-law clause, and neither party disputes its applicability. Dkt. 10, Ex. B at 9 art. 6.4.

[11] To be clear, the sole issue before the court is whether the Capstone entities' claims in the second arbitration are arbitrable under the allegedly valid agreements among the parties. The court expresses no opinion on whether Article VI of the services agreement effects a broad release of any prior arbitration obligations beyond those specifically excluded by the parties' services agreement as held herein. As discussed in detail later in this opinion, see Part II.C, *infra*, that issue is appropriately left to the determination of Judge Andrews in the first-filed case in this dispute.

15

Stewart Feldman to counsel for OSI, in which he states: "We have document production and deposition requests ready to go, but wanted to reach out to you before involving [Ramos]. We're thinking of 10 days for document responses."). This situation thus requires the court to consider its power under federal law to stay an ongoing arbitration, particularly when this court has determined that the dispute is not arbitrable and must be heard in a court located in Harris County, Texas.

To be sure, the FAA contains no explicit textual support for a federal court to stay ongoing arbitration proceedings. But the case law in the Fifth Circuit and in other circuits establishes that, in "appropriate circumstances," the district court may stay an arbitration. *See Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1144 (5th Cir. 1984). Surely one such circumstance is to prevent the continued arbitration of a dispute that is not arbitrable. *See id.* at 1147 (suggesting that a stay order is appropriate by distinguishing the converse situation: "*Moses Cone* makes it clear that only the most exceptional circumstances will justify any action on the part of a federal court that serves to impede arbitration of an *arbitrable dispute*.") (emphasis added); *see also In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011) ("If the parties to this appeal have not consented to arbitrate a claim, the district court was not powerless to prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right."); *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990) ("If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration."), *abrogated on other grounds by Howsam*, 537 U.S. 79, 123 S. Ct. 588 (2002); *Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) (Breyer, Circ. J.) (concluding that "[t]o allow a federal court to enjoin an arbitration proceeding which is not called for by the contract interferes with neither the letter nor the spirit" of the FAA); *cf. Texaco, Inc. v. Am. Trading Transp.*

16

*Co.*, 644 F.2d 1152, 1154 (5th Cir. Unit A May 1981) (upholding a stay of arbitration in which the dispute was not covered by the arbitration clause).

The court finds the First Circuit's *Societe Generale* decision particularly helpful in these circumstances. In that case, then-Judge Breyer pointed to the district court's unquestioned power under the FAA to compel parties to arbitration when a stay of litigation is warranted and the dispute is arbitrable under the relevant agreement. *See Societe Generale*, 643 F.2d at 868. As a corollary to this rule, Judge Breyer found that staying "a party from arbitrating where an agreement to arbitrate is absent is the concomitant of the power to compel arbitration where it is present." *Id.* Accordingly, because the court has found that the second arbitration raises non-arbitrable claims, the court relies on its inherent powers to stay the second arbitration. To hold otherwise would implicitly sanction the arbitrator's asserted powers over the arbitrability determinations in this dispute, decisions that are within this court's jurisdiction. Any and all arbitration proceedings related to the second arbitration are immediately **STAYED** pending further order of this court.

## C. *The Motion to Confirm*

Plaintiff also moves the court to confirm the July 9, 2013 arbitration award issued after the conclusion of the first arbitration. *See* Dkt. 6 at 7 ¶¶ 14–15; *id.*, Ex. 9 (arbitration award). While defendants have not yet responded to the motion to confirm, plaintiff's request requires the court to consider the propriety of continued confirmation proceedings in light of fundamental questions about judicial discretion when a similar matter is pending in another federal court.

The Fifth Circuit follows the general rule that when two cases before different judges raise substantially overlapping issues, the court in which the first case was filed should decide those issues and the second court should defer. *See Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728–29 (5th Cir.1985).

17

"The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *W. Gulf,* 751 F.2d at 728. "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* at 729. Once the second court determines that its case requires resolution of issues that substantially overlap those in the first court, the second court should abate the matter, either through a stay or a dismissal without prejudice to refiling. *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992) (affirming the district court's stay of duplicative claims pending before another court, for the stay order under those circumstances was within its "broad discretion"); *see also First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989) (affirming dismissal without prejudice). Indeed, "[a] stay pending the outcome of litigation between the same parties involving the same or controlling issues is an acceptable means of avoiding unnecessary duplication of judicial machinery." *ACF Indus., Inc. v. Guinn*, 384 F.2d 15, 19 (5th Cir. 1967).

Much ink has been spilled (including by this court) over whether the OSI parties are subject to valid agreements to arbitrate, and who—the court or the arbitrator—should make that determination. Nonetheless, the questions of validity remain before Judge Andrews and may dispose of the motion to compel in his court. *See* De. Case Dkt. 4 (motion to compel) at 16 (framing the critical issue as follows: "Plaintiffs' dispute as to arbitrability rests on only one agreement, referred to by Plaintiffs as the [services agreement], which Plaintiffs allege does not have an arbitration provision and controls in the event of any conflict."). Thus, pending Judge Andrews's decision regarding the validity and potential coverage of the arbitration agreements over the claims in the first arbitration, this court finds that it would be imprudent and inefficient to proceed with its

18

consideration of the motion to confirm that presupposes a valid arbitration agreement. In the interests of judicial comity, the proceedings related to plaintiff's motion to confirm (Dkt. 6) are **STAYED** pending Judge Andrews's resolution of the motion to compel in the Delaware Case.

### III. Conclusion

For the foregoing reasons, plaintiff's motion to compel arbitration (Dkt. 6) is **DENIED**; any and all arbitration proceedings related to the second arbitration are immediately **STAYED** pending further order of this court; proceedings related to plaintiff's motion to confirm (Dkt. 6) are **STAYED** pending Judge Andrews's decision on the motion to compel in the Delaware Case; and the TRO motion (Dkt. 10) is **DENIED AS MOOT**.

To ensure timely receipt and compliance with this order by affected parties and non-parties alike, defendants' counsel is **ORDERED** to serve copies of this order, within two business days of the date of entry of this order, on Ramos, all parties to the first and second arbitrations, Judge Andrews, and all parties to the Delaware Case.

Pending Judge Andrews's ruling on the motion to compel, this case will be **ADMINISTRATIVELY CLOSED**. The defendants' counsel is further **ORDERED** to notify this court of Judge Andrews's decision within seven days of the date of entry of his order.

It is so **ORDERED**.

Signed at Houston, Texas on July 29, 2013.

_____
Gray H. Miller
United States District Judge