# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| POOLRE INSURANCE CORP., *et al.*, | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-13-1857 |
| | § | |
| ORGANIZATIONAL STRATEGIES, INC., *et al.*, | § | |
|     *Defendants*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court are the following motions: (1) a motion for leave to add defendants (Dkt. 20) filed by plaintiffs Capstone Associated Services, Ltd., Capstone Associated Services (Nevada), LP n/k/a Capstone Associated Services (Wyoming), LP, Capstone Insurance Management, Ltd. (collectively, "Capstone"); PoolRe Insurance Corp. ("PoolRe"); and the Feldman Law Firm LLP (the "Firm") (Capstone, PoolRe, and the Firm will be referred to herein as the "Feldman entities"); (2) the Feldman entities' motion to add additional parties to the litigation (Dkt. 21); (3) the Feldman entities' motion to exceed page limits (Dkt. 22); (4) the Feldman entities' amended motion to confirm and compel (Dkt. 23);[1] (5) a motion to vacate (Dkt. 26-1) filed by defendants Nicolette Hendricks ("Nicolette"); William Hendricks ("William") (Nicolette and William are referred to herein as the "Hendrickses"); and Organizational Strategies, Inc. ("OSI") (the Hendrickses and OSI are collectively referred to herein as the "OSI entities"); and (6) PoolRe's motion to strike exhibits to the OSI entities' reply in support of their motion to vacate (Dkt. 41).

---

[1] The Feldman entities captioned this pleading as "Plaintiffs' Expedited <u>Corrected</u> Motion to Compel Arbitration Pursuant to 9 U.S.C. § 4; Motion to Stay Other Proceedings Pursuant to 9 U.S.C. § 3; Request for FRCP 59(e) Motion to Alter or Amend This Court's Memorandum Order and Opinion; and Request for Clarification as to Motion to Confirm." Dkt. 23 at 1. Because the Feldman entities have essentially filed an amended motion for confirmation and to compel arbitration, the court refers to this pleading as the "amended motion to confirm and compel."

After considering the motions, responses, replies, extensive record, and applicable law, the court adjudicates the remaining issues and motions as follows: (1) the stay of the confirmation proceedings is **LIFTED**; (2) the Feldman entities' amended motion to confirm and compel (Dkt. 23) is **DENIED**; (3) the OSI entities' motion to vacate (Dkt. 26-1) is **GRANTED**; (4) the Feldman entities' motion for leave to file excess pages (Dkt. 22) is **GRANTED**; (5) the Feldman entities' motions for leave to add additional defendants (Dkts. 20–21) are **DENIED AS MOOT**; and (6) the Feldman entities' motion to strike exhibits from the OSI entities' reply brief in support of their motion to vacate (Dkt. 41) is **DENIED AS MOOT**.

## I. BACKGROUND

This contract dispute regarding captive insurance companies[2] is now before two federal district courts, the Third Circuit Court of Appeals in Philadelphia, and an arbitral forum in Houston, Texas. Nevertheless, the court will provide a brief summary of the facts that have already been presented to the respective tribunals over the past year, beginning with an identification of the parties to the relevant disputes.[3]

### A. Factual Background

Capstone is a series of related companies that provide turnkey formation and administration services for captive insurance companies. *See* Dkt. 23, Ex. 17 (Capstone's first arbitration demand)

---

[2] A "captive insurance company" is "'organized for the purpose of insuring the liabilities of its owner.'" *Westchester Fire Ins. v. Heddington Ins. Ltd.*, 883 F. Supp. 158, 160 n.4 (S.D. Tex. 1995) (Hittner, J.) (quoting *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1298 n.1 (9th Cir. 1987)). In *Westchester*, for example, Heddington was Texaco's captive insurer, and the named insureds under the policy were Texaco and its subsidiaries. *Id.*

[3] In addition to summarizing the facts in the record of this proceeding, the court will refer to certain filings in the related case now pending before Judge Richard Andrews of the United States District Court for the District of Delaware. *See Organizational Strategies Inc., et al. v. The Feldman Law Firm LLP, et al.*, No. 1:13-cv-764-RGA (D. Del. removed May 2, 2013) (hereinafter the "Delaware Case" or "De. Case"). The court takes judicial notice of the pending judicial proceedings and public documents filed in Judge Andrews's related case. *See Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 246 n.3 (5th Cir. 1997).

2

at 1–2.  Capstone administers PoolRe, a third party insurer that provides pooling insurance services, on behalf of its officers, directors, and owners, *id.* at 2, and the Firm provides legal services related to Capstone's support of captive insurance companies.  *Id.* at 1 n.2.[4]  The Hendrickses manage OSI, a professional services firm that provides systems work for the Department of Defense.  *Id.* at 1.

On April 22, 2011, the Hendrickses participated in a conference call and webinar with the Firm to discuss captive insurance planning options.  *See* Dkt. 6, Ex. 2 (planning memorandum) at 1.  On April 25, 2011, Stewart Feldman ("Feldman"), the Firm's named partner, followed up with a planning memo to the Hendrickses, outlining the process for the provision of services and describing the need for a feasibility study "addressing the application of alternative risk/captive planning to your operating entities."  *Id.*  Feldman explained that the study would encompass a review of OSI's insurance coverage, loss exposure, tax returns, and financial statements.  *Id.*  In addition to document review, the study included an on-site visit to OSI's Washington, D.C. corporate office for further review of financial and legal records related to captive insurance planning.  *Id.*  Feldman added that after completion of a satisfactory on-site review, the Firm would draft a business plan and financial projections for each captive, along with an application to regulators of the captive's domicile to form a property and casualty insurance company.  *Id.* at 2.

Attached to the planning memo was the Firm's billing guidelines, available at the Firm's website, which set forth the parties' respective duties and obligations as part of the attorney/client relationship.  *Id.* at 5.  The guidelines contain the first arbitration agreement at issue in this case, which reads, in pertinent part, as follows:

---

[4] According to the Firm's engagement letter, the Firm is associated with Capstone, "which  is owned by certain of the Firm's lawyers and related parties," in order "to provide many of the needed support services."  Dkt. 6, Ex. 1 (June 20, 2011 engagement letter) at 2.  The letter also states that Capstone is "a significant client of the Firm."  *Id.* at 4.

3

With respect to any and all other disputes and claims whatsoever between us related to or arising out of our services (but in <u>no event</u> for attorneys' fees and/or costs), such shall be submitted to a recognized, neutral, arbitral association or arbitrator for resolution pursuant to its single arbitrator, expedited rules. . . .  If the first arbitration organization or arbitrator which receives a written demand for arbitration of the dispute from either of us does not complete the arbitration to finality within four months of the written demand, either party then may file a written demand for arbitration of the dispute with another recognized, neutral, arbitration association or arbitrator, with the prior arbitration association or arbitrator then being immediately divested of jurisdiction, subject to a decision being rendered by the replacement arbitration association or arbitrator within four months of the written demand being filed with the replacement arbitration group.  All arbitration — regardless of the arbitral organization actually hearing the dispute — shall be conducted pursuant to the Commercial Arbitration Rules of the AAA ["American Arbitration Association"] whose Expedited Procedures shall apply regardless of the size of the dispute with only a single arbitrator hearing the dispute, again all regardless of the organization sponsoring the arbitration in question. . . .   The parties agree that the issue of arbitrability shall likewise be decided by the arbitrator, and not by any other person. That is, the question of whether a dispute itself is arbitrable shall be decided solely by the arbitrator and not, for example, by any court.  In so doing, the intent is to divest the courts of all powers in disputes involving the parties, except for the confirmation of the award and enforcement thereof. . . .

*Id.* at 7 (page 3 of the guidelines).  The provision thus contains two relevant clauses, a "disputes clause" that details the scope of arbitral disputes and the applicable AAA rules, and a "delegation clause" that delegates the power to adjudicate gateway questions of arbitrability to the arbitrator.

After the on-site visit and further review, Feldman sent an engagement letter to the Hendrickses on June 20, 2011 for the "formation and administration of a captive insurance program." Dkt. 6, Ex. 1 at 1.[5]  Nicolette signed the letter, dated June 29, 2011, and the letter indicates a copy was sent to Charles Earls, III, Capstone's President. *Id.* at 11–12.  This multi-year agreement contemplated the formation of two to three "intermediate" captive insurance companies, as defined by section 831(b) of the Internal Revenue Code.  *Id.* at 1.  The three captives were tentatively named Optimal Casualty Corp. ("Optimal"), Systems Casualty Corp. ("Systems"), and

---

[5] PoolRe was not a party to the engagement letter or the services agreement.

Integration Casualty Corp. ("Integration").[6] *Id.*  The captives were formed to underwrite alternative risk programs for the benefit of OSI and its affiliates to protect them against loss exposures beyond those covered by other commercial insurance carriers.  *Id.* at 1–2.  The letter noted that this protection was "especially critical given the niche industry in which OSI operates."  *Id.* at 2.  As a defense contractor with more than 200 staff personnel, OSI maintains field offices across the United States specializing in applied technology and services, and OSI engages in extensive public and private sector contract work.  *Id.*

The engagement letter further specifies that the Firm and Capstone "will handle the design, formation and all aspects of the insurance operations on behalf of the captives, including operating the captives, designing and maintaining the risk coverages and maintaining their accounting records." *Id.* at 3.  The agreement's initial term was three years, to end on December 31, 2013, and upon any cancellation thereafter "Capstone's ongoing responsibilities under the [Capstone Services Agreement would end]."[7] *Id.* at 5.  The engagement letter contains a sixteen month advance-notice termination clause, requiring notice of termination before August 31, 2012.  *Id.*[8]

The Firm encouraged the Hendrickses to retain the services of an accounting firm to review financial matters among the OSI captive entities, and "to review the various state and federal tax returns which will be prepared in draft form for your signature and filing."  *Id.* at 10.  The Firm

---

[6] OSI, Optimal, Systems, and Integration are collectively referred to herein as the "OSI captive entities."

[7] The Capstone Services Agreement (hereinafter the "services agreement"), as described further *infra*, is an agreement that was attached to the engagement letter as Exhibit B, to be executed among Capstone, the Firm, the OSI entities, and the three captives, and it set forth the parties' respective duties and obligations arising from Capstone's services in the formation and administration of OSI's captive insurance program.  Dkt. 6, Ex. B to Ex. 1.

[8] The agreement also states that termination "is predicated upon all payments due Capstone being current as of the time that notice is given."  Dkt. 6, Ex. 1 at 5.

recommended the services of Christine Williamson ("Williamson"), a CPA with the Virginia accounting firm of Watkins Meegan.  *Id.*

Attached to the engagement letter were six documents, including the Firm's billing guidelines and the services agreement.  The attached guidelines contain an arbitration provision identical to the agreement in the guidelines attached to the planning memo.  *See id.* at 15–16.  The services agreement stated that it would be entered among Capstone, the Firm, the OSI entities, and the three captives.  Dkt. 6, Ex. B to Ex. 1 at 1.  The contract parties agreed that the services agreement would become effective at a subsequent date upon the "issuance of the insurance licenses for each of the [captives]."  *Id.*  The services agreement set forth the contract parties' respective rights and obligations, and Capstone described itself as a service provider of turnkey administrative services for small property and casualty insurance companies, including the captives.  *Id.*

After discussing Capstone's services, Article V of the services agreement specifies that Capstone retains the ultimate ownership interest of all documents it prepares for the captives, but the captives possess a limited, non-exclusive license to use the documents during the term of the agreement.  *See id.* at 8–9 art. V.  Article VI contains a venue clause specifying that "[f]or purposes of any disputes arising under Article V of this Agreement, the sole venue and jurisdiction for resolution of such disputes *shall be courts* located in Harris County, Texas.  As to other disputes arising under this Agreement (with the express exception of disputes arising under Article V hereof), venue and jurisdiction *shall be in Delaware*, it being expressly recognized that parallel proceedings may thereby result."  *See id.* at 9 art. 6.4 (emphases added).  Article VI does not refer to the prior broad arbitration clauses contained in the attached billing guidelines of the Firm, but Article 6.1 provides:

> The Parties hereto stipulate and agree that this Agreement amends the Engagement Letter (including its attachments and prior amendments) and agree to bound by the terms and provisions of this Agreement as if incorporated into the Engagement Letter. To the extent of any conflict between the terms and provisions of this Agreement and the Engagement Letter, this Agreement exclusively shall control.

*Id.* at 9 art. 6.1; *accord id.* at 2 art. III ("Any conflict between this Agreement and the Engagement Letter shall be construed in a manner giving precedence to this Agreement in all cases whatsoever."). Lastly, section 6.8 of the services agreement contains a broad merger clause, in which the parties agreed that "[t]his Agreement, including the exhibits, schedules, and other documents and instruments referred to herein, together with the Engagement Documents, embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. With respect to the subject matter of this Agreement this Agreement supersedes all prior agreements and understandings between the parties." *Id.* at 10.

Although both PoolRe and the OSI entities have provided copies of the services agreement to the court, no copy bears the contract parties' signatures. Instead, the OSI entities have filed copies of three letters from Feldman, on Capstone letterhead, memorializing the services agreement among each of the captives in August 2011. Dkt. 26-1, Ex. 1 at 35 (fully executed letter memorializing agreement among Capstone, the Firm, and Optimal); *id.* at 36–37 (executed counterparts of letter memorializing agreement among Capstone, the Firm, and Integration); *id.* at 38–39 (executed counterparts of letter memorializing agreement among Capstone, the Firm, and Systems).[9]

Thereafter, from June 2011 through early 2012, Capstone provided its services under the engagement letter and services agreement to the OSI parties without any apparent material disputes.

---

[9] William signed on behalf of Optimal and Integration, and Nicolette signed on behalf of Systems. Dkt. 26-1, Ex. 1 at 35–39. The letters indicated that the captives were still in formation. *Id.*

Dkt. 23, Ex. 17 at 2.  Also during this time, PoolRe and each captive issued a series of insurance policies to OSI.  Dkt. 33, Ex. D.  Three other reinsurance agreements were entered into between PoolRe and each captive, with policy periods of October 14, 2011 through January 1, 2012.  Dkt. 33, Ex. C.  These three reinsurance policies contain identical arbitration provisions, which state in pertinent part:

> It is hereby understood and agreed that all disputes or differences of any sort which may arise under or in connection with this Policy . . . ***shall be submitted for binding, final and non-appealable arbitration to the International Chamber of Commerce [“ICC”] under and in accordance with its then prevailing ICC Rules of Arbitration.***  The ICC Rules of Arbitration shall control except with respect to the selection of the arbitration panel, which shall consist of one qualified, independent arbitrator selected by the Anguilla, B.W.I. Director of Insurance. . . .  The Arbitration Proceeding shall take place in the Territory of Anguilla, B.W.I.[10]

Dkt. 6, Exs. 3–5 at 12 (emphasis added).

In mid-2012, a disagreement arose when OSI’s retained accounting firm, Watkins Meegan, performed its annual audit and prepared OSI’s tax return.  Dkt. 23, Ex. 17 at 2.  As a result of Watkins Meegan’s work, OSI requested that Capstone change certain accounting information for 2011 involving PoolRe and the three captives.  *Id.*  Capstone denied the request, claiming that it could not justify the alterations.  *Id.*

On August 24, 2012, Nicolette sent written notice to Capstone terminating the engagement letter, purportedly effective December 31, 2013.  Dkt. 21, Ex. 1 at 8.  Then, after continued discussions in late 2012 failed to achieve a resolution of the dispute, PoolRe cancelled its agreements with the captives and returned the total deposit of retention premiums.  Dkt. 23, Ex. 17 at 2.  OSI subsequently claimed that it had not received the refund checks, and PoolRe began a

---

[10] Anguilla is a Caribbean island within the British West Indies (B.W.I.) and is a member of the British Overseas Territories.  *Koehler v. Bank of Berm. (N.Y.) Ltd.*, 229 F.3d 187, 187 n.1 (2d Cir. 2000) (Sotomayor, Circ. J., dissenting from den. of reh’g en banc).  Other members include the Cayman Islands, Bermuda, and the British Virgin Islands.  *Id.*

process of tendering the disputed funds to an escrow account in Anguilla.  *Id.*  Further, in December 2012, after consulting with ethics counsel, the Firm withdrew from further work for OSI until the dispute was resolved.  *Id.* at 3.  On February 26, 2013, OSI sent a letter to Capstone, which the latter contends blocked it from providing further services to OSI under the engagement letter.  *Id.*

### B.  *Procedural Background*

### 1.    Capstone Initiates the First Arbitration

Capstone filed an arbitration demand (beginning the "first arbitration") against the "OSI respondents"[11] on March 12, 2013.  *Id.* at 1.  Capstone stated that its claim arose "out of a breach of contract in which the [OSI respondents] made further performance by [Capstone] impossible."  *Id.*  Capstone forwarded its demand to Dion Ramos ("Ramos")[12] of Conflict Resolution Systems, PLLC ("CRS") in Houston, Texas on Friday, March 15, 2013, and requested that he appoint an arbitrator and set a scheduling order.[13]  Dkt. 6, Ex. 7 at 3.  On Monday, March 18, 2013, Ramos appointed himself as the arbitrator of the first arbitration pursuant to CRS procedures.  *Id.* at 2–3.

On March 29, 2013, the director of the Anguilla Financial Services Commission, Keith Bell, sent a letter to "PoolRe Property & Casualty Insurance Corporation, c/o Capstone Insurance Management (Anguilla), Ltd." located in The Valley, Anguilla, to Feldman's attention. Dkt. 6, Ex. 6 (letter from director Keith Bell).  The letter related to PoolRe's dispute with the captives, for

---

[11] Capstone's arbitration demand named the OSI entities and additional companies "in privity" with them as respondents, "includ[ing] Optimal Casualty Corp., Integration Casualty Corp., and Systems Casualty Corp. and the insureds listed in their various insurance policies."  Dkt. 23, Ex. 17 at 1 n.1.  The entire group of respondents, which includes the OSI entities and the companies purportedly "in privity" with them, *see infra* n.16 for a full list of the captives and other insureds, are collectively referred to herein as the "OSI respondents."

[12] Ramos is a former civil district judge of the 55th Judicial District Court of Harris County, Texas.

[13] Capstone's arbitration demand was emailed to the arbitrator by a senior counsel of RSL Funding, LLC, a non-party to the arbitration and both federal court cases. Dkt. 6, Ex. 7 (email string) at 3–4.  RSL Funding's senior counsel identified himself as Capstone's "attorney of record in this arbitration."  *Id.* at 3.

which PoolRe was seeking arbitration under the reinsurance agreements' arbitration clauses quoted above.  *Id.*  Bell notified Feldman that he understood that certain arbitration provisions in insurance agreements designated "the Anguilla, B.W.I. Director of Insurance" to select an independent arbitrator for dispute resolution.  *Id.* at 1.  Bell further explained that while there was no such official in Anguilla, he designated Ramos and CRS to select the independent arbitrators and to administer related arbitration proceedings.  *Id.* at 1–2.  He also directed that further contact should be made with Ramos at his Houston address.  *Id.*  Notably, Bell failed to explain why the dispute was not being submitted to the ICC under its then-prevailing rules, as mandated by PoolRe's reinsurance agreements.  Dkt. 6, Ex. 3–5 at 12.

On April 15, 2013, the OSI respondents appeared in the first arbitration, filing a pleading entitled a "Response to Demand for Arbitration, Motion to Dismiss for Lack of Arbitrability and, in the Alternative, Counterclaims."  Dkt. 21, Ex. 1.  The OSI respondents objected to the arbitration itself and "the authority of this arbitrator."  *Id.* at 1 n.1.  They also moved to dismiss Capstone's demand on grounds that the services agreement's venue clause (article 6.4) superseded the arbitration provision of the billing guidelines attached to the engagement letter.  *Id.* at 10–14.  Lastly, the OSI respondents filed five counterclaims, for professional negligence, breach of fiduciary duty, fraud in the inducement, breach of contract, and declaratory judgment.  *Id.* at 14–18.  As part of the OSI respondents' breach of fiduciary duty counterclaim, they pled that Feldman owned and controlled Capstone and PoolRe, which was an inherent conflict of interest and a violation of Feldman's duty of loyalty to the OSI respondents.  *Id.* at 15.  They also requested relief in the form of a declaratory judgment for the return of all consideration as a result of Feldman and Capstone's alleged material breach in developing and performing the captive insurance program.  *Id.* at 17.

On April 22, 2013, the Firm and PoolRe intervened in the first arbitration against the OSI respondents.  Dkt. 23, Ex. 17 at 24.  The Firm sought a declaratory judgment that it had no liability to the OSI respondents related to its legal services and that it did not breach the engagement letter. *Id.*  PoolRe joined the arbitration, consistent with Bell's March 29th referral letter, "for the limited purpose of having [Ramos] appoint an Anguilla-based arbitrator" to arbitrate the disputes under the reinsurance agreements.  *Id.* at 25.  PoolRe added that it sought a declaratory judgment that it had no liability to the OSI respondents for the cancellation of the 2012 reinsurance policies.  *Id.*

The following day, April 23, 2013, the Feldman entities filed their response to the OSI respondents' motion to dismiss.  Dkt. 23, Ex. 17 at 6.  The Feldman entities contended that the arbitrator should exercise jurisdiction over the dispute based on five separate arbitration agreements, contained in two copies of the Firm's billing guidelines attached to the planning memo and engagement letter and PoolRe's three reinsurance agreements.  *Id.* at 10.

On April 29, 2013, Ramos issued a preliminary ruling on jurisdiction via email to the parties. Dkt. 23, Ex. 13 (email string) at 1.  Ramos determined that under the planning memo and engagement letter, he had jurisdiction to determine the arbitrability of Capstone's claims.  *Id.* Pursuant to that authority, he found that the claims among the Firm, Capstone, and OSI were arbitrable, including any claims for attorneys' fees and/or costs "if they relate in any way to 'any and all other disputes or claims' between the parties."  *Id.*  With regard to PoolRe's arbitration clauses in the reinsurance agreements, Ramos found that he had jurisdiction and determined that PoolRe's intervention waived its right to have the proceeding in Anguilla "and that Houston, Harris County Texas [is] an appropriate place for the Arbitration."  *Id.*  Lastly, Ramos rejected the OSI respondents' contention that the services agreement mandated arbitration outside Houston, and

11

Ramos held that the broad arbitration clauses in the engagement letter and planning memo controlled and had no forum-selection requirements.  *Id.*

On April 30, 2013, the OSI respondents' counsel objected to Ramos's ruling via email.  Dkt. 26-1, Ex. C to Ex. 2 at 1–2.  Counsel's email specifically objected to Ramos's decision that rejected the PoolRe agreements' selection process and removed the arbitration from the ICC's jurisdiction and procedures:

> Neither PoolRe nor You[r] Honor can now unilaterally amend insurance policies to change the identity of the Anguilla party authorized to appoint an arbitrator, move the venue of that arbitration out of Anguilla, or apply AAA expedited rules to an arbitration that is to be conducted under the ICC Rules.  Article 5 of the ICC Rules provides my clients 30 days from the date of receipt in which to submit an Answer and Counterclaims to a Request for Arbitration.

*Id.* at 2.

The following day, on May 1, 2013, Ramos formally denied the OSI respondents' motion to dismiss, holding as follows:

> The Arbitrator finds the Claimant's Arbitration Demand claims violations by the Respondents of the lawfirm's engagement agreement and the [services agreement].  Clearly the lawfirm's actions under the engagement letter are subject to the Arbitration clause. . . .  The Arbitrator finds that the written agreements between the parties have a valid Arbitration clause which requires all parties to Arbitrate their claims rather than seeking relief in courts.

Dkt. 23, Ex. 16 at 1.

### 2.       The OSI Captive Entities File the Delaware Case

But even as the first arbitration continued, the OSI captive entities (OSI and the three captives) filed suit in the Delaware Court of Chancery in late April 2013, asserting claims against Capstone, the Firm, and Feldman individually for professional negligence, malpractice, fraud in the inducement, and breach of contract.  Dkt. 23, Ex. 13 at 2.[14]  Vice Chancellor Sam Glasscock, III of

---

[14] PoolRe was not a named party to the Delaware case.

12

the Delaware chancery court issued a *status quo* order on May 1 and set a hearing on the application

for a temporary restraining order ("TRO") on May 6, which, if granted, would have stayed the first

arbitration.  Dkt. 26–1, Ex. 13.  But before the TRO hearing, Capstone removed the case to federal

court in Delaware.  Dkt. 7 (the OSI entities' answer) at 4 ¶ 12.

Upon removal the Delaware Case was ultimately assigned to Judge Richard G. Andrews.

*Id.*   On May 13, 2013, Capstone filed a motion to compel arbitration and stay the federal

proceedings.  De. Case Dkt. 4.  On May 24, 2013, Judge Andrews denied the TRO request, vacated

the *status quo* order, and held the motion to compel in abeyance for further briefing.  De. Case Dkt.

18.  On June 14, the Firm and Capstone filed a motion to dismiss on grounds that the arbitrability

of the pending disputes should be decided by Ramos in the first arbitration.  De. Case Dkt. 24.

### 3.   PoolRe Files A Motion to Confirm Before the First Arbitration Hearing Begins

Meanwhile, back in Houston, as the Feldman entities and OSI respondents were preparing

for the June 26, 2013 hearing,  PoolRe filed a motion to confirm in the instant case on June 25, in

which PoolRe applied "to this Court for an order confirming a forthcoming arbitration award."  Dkt.

1 (confirmation motion) at 1.[15]  Recognizing the unusual step of a litigant seeking confirmation of

an award that had not yet been entered, the court issued a show cause order on June 27, 2013 and

ordered PoolRe to demonstrate why the court should not dismiss the case for want of jurisdiction.

*See* Dkt. 4 (order to show cause) at 1; 9 U.S.C. § 9 (providing jurisdiction for the court to confirm

an arbitration award "at any time within one year *after* the award is made") (emphasis added).  The

court ordered PoolRe to respond no later than July 9, 2013.  Dkt. 4 at 1.

---

[15] PoolRe purportedly filed this pleading on behalf of the Feldman entities.  Dkt. 6 at 1.  As further explained *infra*, Capstone and the Firm appeared as plaintiffs in this case on August 26, 2013,  Dkts. 17–18, and joined PoolRe's motions filed on that date, including the amended motion to confirm and compel.  Dkt. 23.

### 4.      The First Arbitration Hearing is Held, with the Second Arbitration to Follow

Returning to the arbitration, on Sunday, June 23, three days before the merits hearing in the first arbitration was set to begin, Capstone filed a second arbitration demand alleging that the OSI parties breached Article V of the services agreement.  Dkt. 6, Ex. 10 (new demand in the "second arbitration") at 2 ¶ 2.  The following day, on Monday, June 24, the Feldman entities filed a notice purportedly withdrawing the second demand because they "incorrectly failed to note that their May 13, 2013 pleading identified misuse and dissemination of confidential and proprietary information and trade secrets in violation of the parties' contractual agreements as one of their claims. Yesterday, [the Feldman entities] incorrectly filed this as a new claim and incorrectly stated that such was not a claim in the pending arbitration."  Dkt. 9, Ex. A (the Feldman entities' correction) at 1–2.  When the first arbitration hearing began two days later on Wednesday, June 26, Ramos deferred consideration of the new demand, concluding: "I think I have to treat that as a new claim for arbitration that was filed on Sunday.  So it won't be part of this case."  *See* Dkt. 9, Ex. B (Arb. Hr'g Tr., June 26, 2013) at 5:6–8.  The first arbitration hearing concluded the following day on Thursday, June 27, 2013.  Dkt. 6, Ex. 9 (arbitration award) at 1.

That same day, as the first arbitration concluded, the parties agreed to the submission of post-hearing briefing and affidavits for attorneys' fees to the arbitrator by the close of business on July 3, 2013.  Dkt. 26-1, Ex. 11 at 4 (Arb. Hr'g Tr., June 27, 2013) at 643–44.  On July 4, 2013, after Ramos granted the Feldman entities a one-day filing extension, they filed their brief and a proposed arbitration award.  *Id.* at 3 (email string); Dkt. 26-1, Ex. 9 at 1–2 (cover email); *id.* at 3–11 (proposed award).  On the afternoon of Monday, July 8, 2013, the OSI respondents' counsel requested that Ramos strike the proposed award as exceeding the parties' agreement on post-hearing submissions. Dkt. 26-1, Ex. 10 at 1.  Later that evening, the Feldman entities filed a post-hearing reply brief and

motion to strike the OSI respondents' application for attorneys' fees. Dkt. 26-1, Ex. 11 at 1–2. On the morning of Tuesday, July 9, the OSI respondents' counsel responded to the Firm's filing and moved to strike the reply brief, again for exceeding the parties' briefing agreement. *Id.* at 1.

Later that day, Ramos issued the first arbitration's award, which was nearly identical to the proposed award provided by the Feldman entities. Dkt. 6, Ex. 9. The award identified "Claimants" collectively as PoolRe, Capstone, and the Firm (herein designated as the Feldman entities). *Id.* at 1. The award cited the OSI respondents as the "Respondents," namely "Organizational Strategies, Inc. ('OSI'), Nicolette Hendricks, William Hendricks and those in privity with any of the aforementioned." *Id.*[16] Ramos described the proceedings as conducted "generally under the AAA Commercial Arbitration Rules, single arbitrator, expedited rules wherein the parties opted for the optional rules concerning emergency procedures." *Id.* at 2.

Ramos found that the OSI respondents materially breached the June 20, 2011 engagement letter through their purported August 24, 2012 termination notice. *Id.* at 2–3. He further found that the "evidence proves the [OSI respondents] breached the contracts with [the Feldman entities] and $15,000.00 is due Capstone per quarter, due and payable February 1st, July 1st, September 1st and December 1st from January 1, 2013 through December 31, 2016 for each of the three captives." *Id.* at 3 ¶ 2. As to the Feldman entities' request for declaratory relief, Ramos found that neither the Firm nor any of its attorneys were liable for professional negligence or breach of fiduciary duty to the OSI respondents. *Id.* at 4–5 ¶ 5(ii). He also found that "PoolRe is properly joined in the existing arbitration involving Capstone and the Firm pursuant to its own arbitration agreements and ancillary

---

[16] The award stated that "[t]hose in privity with the Respondents include Optimal Casualty Corp., Integration Casualty Corp., Systems Casualty Corp., OSI Property Holdings, LLC; Widewater Property Holdings LLC; Aquia Property Holdings, LLC; Hwang (Hendricks) Condominium, LLC; Hendricks Lodge LLC; Judith River Aviation LLC; Judith River Ranch LLC; Melwood Holdings 1 LLC; Melwood Holdings 2 LLC; Shore Drive LLC; Hendricks Farm LLC; Cedar Stone Arena, LLC; and Cedar Stone Lodge, LLC." Dkt. 6, Ex. 9 at 1 n.1.

15

to the otherwise pending arbitration." *Id.* at 5 ¶ 5(iii).  Lastly, Ramos awarded the Feldman entities "attorney's fees, expenses and costs . . . in the amount of $451,244.44 to be divided among themselves as they see fit." *Id.* at 4 ¶ 3.  This amount included fees and expenses borne by the Feldman entities in defense of the Delaware case, which Ramos found were unjustified in light of the parties' five arbitration agreements and the goal of arbitration to provide a "cost efficient and expeditious resolution" of the parties' disputes. *Id.* at 7 ¶ 7.[17]

As to the OSI respondents' counterclaims, Ramos denied the claims against PoolRe on grounds that PoolRe had a right to exclude the OSI respondents from its pooling arrangement for any reason whatsoever. *Id.* at 5–6 ¶ 6(I).  Second, Ramos denied any relief for the OSI respondents' breach of fiduciary duty counterclaim, explaining as follows:

> The Arbitrator has found no fiduciary duty in the case of the [the Feldman entities] generally or in the case of Capstone and PoolRe no fiduciary duty is due.  No factual evidence was presented to establish any breach of fiduciary duty by the [the Feldman entities].  Thus, [the OSI respondents'] breach of fiduciary duty claim against the [the Feldman entities] is denied in its entirety.

*Id.* at 6 ¶ 6(ii).  The OSI respondents' counterclaim for declaratory relief, attorneys' fees, and costs were denied. *Id.* at 4–6 ¶¶ 4, 6(iv).

Finally, Ramos directed the parties to proceed as follows with confirmation proceedings:

> [The Feldman entities] may at their option enter this Final Arbitration Award with the U.S. District Court for the Southern District of Texas as set out in 9 U.S.C. § 9 and thereafter may domesticate the judgment in any state in which it deems appropriate, at its own expense, with the [OSI respondents] ordered to cooperate.  The [OSI respondents] are directed to dismiss the existing Delaware litigation with prejudice and proceed to contest the arbitration as they wish under 9 U.S.C. § 10, 11 in Houston, TX in the federal courts for the Southern District of Texas, Houston Division.

*Id.* at 7 ¶ 8.

---

[17] Ramos did not explain why he awarded these additional attorneys' fees and costs to the Feldman entities collectively, when PoolRe was not a party to the Delaware case.

And so PoolRe returned to this court.  Late in the evening on July 9, 2013, PoolRe timely filed its response to the court's order to show cause regarding jurisdiction over the confirmation proceedings, Dkt. 5, and filed a second amended petition.  Dkt. 6.  PoolRe notified the court of Ramos's decision, stating that "[t]he arbitrator issued an Arbitration Award concerning all of the matters that were the subject of the first arbitration on July 9, 2013."  *See id.* at 7 ¶ 14.[18]  The second amended petition restated PoolRe's original motion to confirm the arbitration award that was rendered in PoolRe's favor, and PoolRe also moved the court to compel the defendants to the second arbitration, which was already underway before Ramos.  *Id.* at 7–9.  On July 11, the summons were issued, and the OSI entities answered PoolRe's second amended petition on July 23, 2013.  Dkt. 7.  The OSI entities concurrently filed a brief in opposition to the motion to compel arbitration (Dkt. 9) and a motion for a TRO to stay the second arbitration.  Dkt. 10.

### 5.    The Second Arbitration Begins, but Is Subsequently Stayed

Meanwhile, as more pleadings were being filed in this court, the second arbitration was well underway.  On July 18, 2013, the Firm and PoolRe (the "intervenors") intervened "for post-arbitration award violations of the arbitrator's orders."[19]  Dkt. 23, Ex. 10 at 4 ¶ 8; Dkt. 23, Ex. 11 (intervention in second arbitration)  at 2 ("The Intervenors seek additional enforcement orders and continuing attorneys fees arising out of the [OSI respondents'] [new] breaches of the Award as entered by the Arbitrator.").  On July 27, 2013, the Feldman entities filed an amended and restated

---

[18] For the sake of precision, the court notes that PoolRe filed its response at 11:26 p.m. (CDT) on July 9, and then filed its second amended petition at 1:06 a.m. (CDT) on July 10, 2013.  Dkts. 5–6.

[19] Also on July 18, 2013, Capstone, Feldman, and the Firm filed a reply in support of their pending motion to dismiss in the Delaware case in which they notified Judge Andrews of the status of the second arbitration proceedings.  Dkt. 23, Ex. 10 at 4 ¶¶ 7–8; De. Case Dkt. 34 at 4 ¶¶ 7–8.  They stated that "[b]ecause [the first] arbitration has been completed, awards are being confirmed in the Texas District Court and additional arbitration proceedings are pending in order to cover any remaining disputes between the parties, the question of whether arbitration should be compelled is moot."  *Id.* at 4 ¶ 9.

arbitration demand, in which they collectively sought additional relief relating to the OSI respondents' purported breaches of the July 9 arbitration.  Dkt. 23, Ex. 12 at 2–3.

Two days later, on July 29, 2013, this court issued a memorandum opinion and order addressing the pending motions.  Dkt. 12.  With regard to PoolRe's motion to confirm the award in the first arbitration, the court stayed the proceedings pending Judge Andrews's decision on the motion to compel, as he was the first judge asked to address the validity and potential coverage of the relevant arbitration agreements.  *Id.* at 17–19.  The court also denied PoolRe's motion to compel the second arbitration.  *Id.* at 10–15.  The court determined that although the engagement letter's arbitration provision contained a broad grant of arbitrability and delegation of such determinations to an arbitrator, the services agreement's contrary intent that certain disputes be heard in the courts of Harris County, Texas created an ambiguity as to the parties' delegation intentions.  *Id.* at 12–14.  This ambiguity, under the court's reasoning, precluded a finding that the "services agreement 'clearly and unmistakably' reaffirms the delegation clause."  *Id.* at 14 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945, 115 S. Ct. 1920 (1995) (stating that courts hesitate to find that, in the face of silence or ambiguity, the parties gave the arbitrator the power to make the traditional judicial determination "on the 'who should decide arbitrability' point")).  In such circumstances, the court retained the power to decide the threshold arbitrability question, and the court found that the dispute over Capstone's intellectual property rights, which arose under Article V of the services agreement, was not arbitrable under the venue clause.  *Id.* at 14–15.  Pursuant to this finding, the court denied PoolRe's motion to compel and stayed the second arbitration.  *Id.* at 15–17; *Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1144 (5th Cir. 1984); *see also Societe Generale de Surveillance, S.A. v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) (Breyer, Circ. J.) (concluding that "[t]o allow a federal court to enjoin an arbitration proceeding

which is not called for by the contract interferes with neither the letter nor the spirit" of the Federal Arbitration Act ("FAA")).

### 6.      After the Court's Order, the Feldman Entities Return to the Second Arbitration

On August 16, 2013, the Feldman entities filed a "First Amended & Restated Arbitration Demand" (the "live demand") in the second arbitration.[20]   Dkt. 23, Ex. 14.  The live demand included claims for "continuing breaches (those being post-final arbitration hearing of June 26–27, 2013) of the parties' contractual agreements and the orders set forth in the Arbitration Award" and Capstone's claim for misuse of intellectual property that is "ancillary to the first proceeding."[21]  *Id.* at 3–5.  The Feldman entities explained that they were holding the intellectual property claim, as to Capstone only, in abeyance pending clarification of this court's July 29, 2013 opinion.  *Id.* at 5 n.4. Specifically, the Feldman entities stated as follows:

> [T]he claims of the Firm and PoolRe as to the misuse of confidential, proprietary and trade secret information are intended to proceed in the [second arbitration], with only Capstone's claim stayed until the matter is addressed by Judge Miller.

*Id.*  The OSI respondents' counsel objected to this filing via email to Ramos on August 20, 2013, arguing that the live demand violated this court's stay order.  Dkt. 14, Ex. A at 1.  He demanded that the Feldman entities withdraw the live demand and warned that "[f]ailure to withdraw the amended filing and assure us of future compliance by this afternoon will be construed as the participants' refusal to comply with our demand."  *Id.*

The Feldman entities did not comply with the request, and on August 21, 2013, the OSI entities filed a motion for an order to show cause why the Feldman entities should not be held in

---

[20]The Feldman entities state that this is the "live and updated arbitration demand" in the second arbitration and "now lies at the heart of any ruling to be made by this Court."  Dkt. 23 at 13 (citing Dkt. 23, Ex. 14).

[21] The Firm and PoolRe joined Capstone in asserting the intellectual property claim against the OSI respondents. Dkt. 23, Ex. 14 at 5.

civil contempt.  Dkt. 14.  The motion argued that the Feldman entities were not complying with the court's stay order and should be sanctioned accordingly.  *Id.* at 3–4.  However, before a hearing on the OSI entities' motion, Ramos informed the parties that he would not proceed with the live demand asserted in the second arbitration.  Dkt. 24, Ex. A at 1 ("I find Judge Miller's [stay] order broad enough to cover any further arbitration of these claims.").

### 7.     The OSI and Feldman Entities Return to This Court

On August 26, 2013, the Firm and Capstone formally joined the confirmation proceedings as plaintiffs in this case.  Dkts. 17–18.  The Feldman entities concurrently filed a motion for leave to file several motions, including the amended motion to confirm and compel.  Dkt. 16.  On October 9, 2013, the OSI entities filed a motion to lift the stay of the confirmation proceedings and a motion to vacate the award in the first arbitration.  Dkt. 26.  On October 10, the court granted the Feldman entities' motion for leave to file (Dkt. 16) and the OSI entities' motion to lift the stay (Dkt. 26).  *See* Dkt. 27 (court's order).

The OSI entities filed their response to the pending motions on November 8, 2013, Dkt. 33, and PoolRe filed a response to the motion to vacate on November 13, 2013.  Dkt. 36.[22]  PoolRe replied to the OSI entities' response on November 18, Dkt. 38, and the OSI entities replied to PoolRe's response to the motion to vacate on November 20, 2013.  Dkt. 40.  The OSI entities' reply included the entire transcript of the first arbitration and two additional affidavits.  *See id.*, Exs. A–B.  PoolRe objected to the filing of additional evidence on reply and moved to strike the additional exhibits from the court's consideration of the motion to vacate.  Dkt. 41.  The OSI entities responded to PoolRe's motion to strike on December 6, Dkt. 42, and PoolRe replied on December 12.  Dkt. 43.

---

[22] Capstone and the Firm responded to the motion to vacate on March 26, 2014.  *See* Dkt. 47.

In sum, the motions that remain pending before the court are as follows: (1) the Feldman entities' motion for leave to add defendants (Dkt. 20); (2) the Feldman entities' motion to add the captives as parties to the litigation (Dkt. 21); (3) the Feldman entities' motion for leave to file excess pages (Dkt. 22); (4) the Feldman entities' amended motion to confirm and compel (Dkt. 23); (5) the OSI entities' motion to vacate (Dkt. 26-1); and (6) PoolRe's motion to strike exhibits (Dkt. 41). These motions are ripe for disposition.

### 8.      The Delaware Case Proceeds to Judgment

Before turning to its analysis, however, the court notes several recent developments in the Delaware case.  On February 12, 2014, Judge Andrews decided the pending motions to dismiss for lack of subject-matter and personal jurisdiction.[23] Dkt. 44, Ex. 1.  Judge Andrews found a valid arbitration clause, as modified by the venue clause in the services agreement.  He construed the contract parties' agreements to establish the fora for resolution of disputes as follows:

> Certain fee disputes would be handled by the Houston Bar Association.  Article V disputes belong in the Harris County courts.  All other disputes must be resolved by a Delaware arbitrator.

*Id.* at 4–5.  Based on this holding, Judge Andrews explained that "[s]ince the integrated agreement [the engagement letter and its attachments] requires arbitration except for limited circumstances not present in this case, the motions to dismiss for lack of subject matter jurisdiction must be granted."

*Id.* at 5.  He further dismissed Feldman's motion to dismiss for lack of personal jurisdiction as moot.

*Id.* at 5 n.5.

---

[23] The defendants in the Delaware case, namely Feldman, the Firm, and Capstone, filed three motions to dismiss that were pending at the time of Judge Andrews's February order.  Two of those motions sought dismissal and stay on grounds that the parties' dispute was covered by the relevant arbitration agreements and that the arbitrator's rulings precluded further consideration of these claims and issues.  De. Case Dkts. 24, 40.  Feldman filed a separate motion to dismiss for lack of personal jurisdiction.  De. Case Dkt. 26.  Capstone's previous motion to compel arbitration (Dkt. 4) was withdrawn on August 16, 2013.  De. Case Dkt. 42.

On February 26, 2014, Capstone and the Firm filed a motion for clarification or reconsideration of Judge Andrews's opinion. De. Case Dkt. 52. Capstone and the Firm requested that Judge Andrews clarify that the arbitration agreement was unambiguous and enforceable, and further find that he lacked jurisdiction to determine any other issue, such as venue, which they claimed was the exclusive province of the arbitrator. *Id.* at 1–2. The OSI captive entities responded to the motion for clarification with three pleadings filed on March 13, 2014. First, the OSI captive entities responded that "[t]his Court's ruling that a Delaware arbitrator must preside over any proceeding is correct, binding, and needs no clarification." De. Case Dkt. 53 at 1. Second, they filed a motion to compel arbitration of the pending dispute before James Green, Sr., Esq., a Delaware arbitrator. De. Case Dkt. 54 at 1. Lastly, the OSI captive entities filed a notice of appeal of Judge Andrews's decision. De. Case Dkt. 55. The United States Court of Appeals for the Third Circuit subsequently issued an order staying the appeal pending the disposition of the pending motion for reconsideration, De. Case Dkt. 58, and Capstone, the Firm, and Feldman filed a cross-appeal of Judge Andrews's ruling on Friday, March 21, 2014. De. Case Dkt. 59.

## II. ANALYSIS

As discussed above, there are five pending motions before the court. The key motions are the Feldman entities' amended motion to confirm and compel and the OSI entities' motion to vacate. Because the court's resolution of these motions resolves the remaining issues, the court evaluates the amended motion to confirm first, which subsumes an analysis of the motion to vacate, and the court then turns to the amended motion to compel.

### A. The Amended Motion to Confirm & The Motion to Vacate

The Feldman entities re-urge their motion to confirm the arbitration award, contending that the court should not wait for Judge Andrews's decision, which was issued in February, regarding

the validity of the arbitration agreement in the billing guidelines.  Dkt. 23 at 14–16.  They further argue that the court should confirm the award and respect Ramos's decisions on jurisdiction and merits of a dispute that was arbitrable under five separate arbitration agreements.  *Id.*

The OSI entities disagree, responding that there is no valid arbitration agreement at issue and, therefore, no valid arbitration award to confirm.  Dkt. 33 at 1.  The OSI entities further move to vacate the award under Section 10 of the FAA on several grounds, including (1) Ramos's alleged misconduct; (2) Ramos's alleged partiality toward the Feldman entities; and (3) Ramos's assumption of jurisdiction over the dispute in excess of his contractually-assigned powers.  *Id.* at 7.

Because the court finds that Ramos incorrectly assumed jurisdiction over PoolRe's claims under reinsurance agreements mandating arbitration before the ICC, and that this decision requires vacatur of the award, the court declines to address the OSI entities' first two grounds in the motion to vacate.  After discussing the general law of arbitration under the FAA, including the standard for vacating awards rendered in excess of an arbitrator's jurisdiction, the court explains the reasons for its decision in this case.

### 1. <u>Background Law on Confirmation/Vacatur of Arbitration Awards</u>

For nearly a century, the federal courts in this country, pursuant to a clear congressional directive, have enforced parties' agreements to arbitrate their disputes.  *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681–82, 130 S. Ct. 1758 (2010).  The Federal Arbitration Act, originally enacted as the United States Arbitration Act in 1925, provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Before the institution of arbitration proceedings, a party to a purported agreement may

request an order from a federal district court directing that "arbitration proceed in the manner provided for in such agreement." *Id.* § 4. Further, the FAA provides that when the parties agree to the appointment method for an arbitrator or arbitral body, the agreed method "shall be followed." *Id.* § 5. With these contractual principles in mind, the Supreme Court has frequently reminded lower courts that "private agreements to arbitrate are enforced according to their terms" because arbitration "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248 (1989); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57–58, 115 S. Ct. 1212 (1995).

This adherence to contract law is essential to understanding the arbitrator's power, which is wholly derived from the parties' agreement to utilize arbitration as a dispute resolution mechanism in lieu of the judicial process. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49, 106 S. Ct. 1415 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"). Indeed, arbitrators have "no general charter to administer justice for a community which transcends the parties" but rather are "part of a system of self-government created by and confined to the parties." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S. Ct. 1347 (1960) (internal quotation marks omitted).

Moreover, after the parties have participated in an arbitration, the confirmation of an arbitrator's award is a summary proceeding. *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). The court's review at this stage is "exceedingly deferential." *Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 401 (5th Cir. 2007) (internal quotation marks omitted), *overruled on other grounds by Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 584–86, 128 S. Ct. 1396 (2008). Exceeding deference, however, is not tantamount to a blind

rubberstamp.  While the FAA commands that the court "'must grant'" the motion to confirm, there are several well-delineated exceptions that permit a denial of confirmation when "'the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.'"  *Hall St.*, 552 U.S. at 587 (quoting 9 U.S.C. § 9).

Under Section 10(a) of the FAA, the court "may make an order vacating the award" in the following four circumstances: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators . . .; (3) where the arbitrators were guilty of misconduct . . .; or (4) where the arbitrators exceeded their powers . . . ." 9 U.S.C. § 10(a).  The fourth exception, as discussed above, derives its force from the general rule that an arbitrator's powers are "'dependent on the provisions under which the arbitrators were appointed.'"  *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 672 (5th Cir. 2002) (quoting *Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831 (11th Cir. 1991)).  Arbitrators exceed those powers when they act "contrary to express contractual provisions," particularly regarding the scope of their authority.  *Delta Queen Steamboat Co. v. AFL-CIO*, 889 F.2d 599, 602, 604 (5th Cir. 1989) (holding that "where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end"); *see also Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (citing *E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62, 121 S. Ct. 462 (2000) (holding that "as long as [an honest] arbitrator is even arguably construing or applying the contract *and* acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision") (internal quotation marks omitted and emphasis added)).  In other words, "[i]f the contract creates a plain limitation on the authority of an arbitrator, [the court] will vacate an award that ignores the limitation."  *Apache Bohai*, 480 F.3d at 401; *see also Smith v. Transp. Workers Union of Am.*, 374 F.3d 372, 374–75 (5th Cir. 2004).  This

determination is not made lightly, however, and "[a] reviewing court examining whether arbitrators exceeded their powers must resolve all doubts in favor of arbitration." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 343 (5th Cir. 2004) (internal quotation marks omitted).

In *Delta Queen*, the Fifth Circuit construed a collective bargaining agreement's arbitration provision and found that although the arbitrator had jurisdiction to determine whether "proper cause" existed for company discipline, he could not impose the disciplinary relief that was the sole province of management. *Delta Queen*, 889 F.2d at 602–04.   Consistent with *Delta Queen*, subsequent decisions from the circuit have fashioned the following rule: If an arbitrator clearly intrudes on an issue reserved for an alternative decisionmaker or that is removed from anyone's discretion, the arbitrator exceeds his powers. *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 410–11 (5th Cir. 2003) ("[I]f the relevant bargaining agreement requires just cause for dismissal, an arbitrator acts beyond his jurisdiction by fashioning an alternate remedy once it has concluded—implicitly or otherwise—that an employee's conduct constitutes just cause for dismissal"); *E.I. DuPont de Nemours & Co. v. Local 900 of the Int'l Chem. Workers Union*, 968 F.2d 456, 459 (5th Cir. 1992) (affirming the district court's determination that an arbitrator exceeded his authority to determine a remedy after finding just cause for termination).

To be sure, the parties can agree to delegate the question of arbitrability to the arbitrator, but the court will only give effect to such delegation when there is "clear and unmistakable" evidence that the parties agreed to arbitrate arbitrability. *First Options*, 514 U.S. at 944–45; *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674–75 (5th Cir. 2012); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472–73 (1st Cir. 1989) (holding that incorporation of ICC Rules into the parties' arbitration agreement is clear and convincing evidence that the parties agreed to "submit issues of arbitrability to the arbitrator").   But even if the court finds that an effective

delegation clause exists, that clause, by its very terms, delegates the arbitrability question to a particular decisionmaker and sometimes a specific arbitral forum. *See, e.g.*, *In re Salomon Inc. S'holders' Derivative Litig.*, 68 F.3d 554, 561 (2d Cir. 1995).

In *Salomon*, for example, shareholders in Salomon Inc. and Salomon Brothers, Inc. (collectively, "Salomon") brought a derivative suit alleging securities and common-law claims arising from the Treasury bond scandal that ultimately led to the bank's acquisition by Traveler's Insurance Group in 1997. *Id.* at 555; Cynthia A. Williams, *The Securities & Exchange Commission & Corporate Social Transparency*, 112 HARV. L. REV. 1197, 1278 n.419 (Apr. 1999) (discussing the 1991 bond scandal as a potential factor weakening the investment bank and causing its takeover).[24] The defendants, including ex-Salomon officials, moved to compel arbitration under the FAA at the New York Stock Exchange ("NYSE"), the forum designated by the agreements. *Salomon*, 68 F.3d at 555. After the NYSE declined to arbitrate the dispute, the defendants returned to the district court and sought the appointment of substitute arbitrators under Section 5 of the FAA.[25] *Id.* at 555–56. The district court denied the motion and set the case for trial in October 1995. *Id.* at 556.

Before the trial began, however, the defendants filed an interlocutory appeal of the court's decision to the Second Circuit Court of Appeals. *Id.* at 556–57. They argued that the arbitration agreements did not meet the "clear and unmistakable" test from the Supreme Court's *First Options*

---

[24] In 1991, certain Salomon brokers made unauthorized bids during a T-bill auction that enabled the company to obtain a near monopoly in the auction. *Salomon*, 68 F.3d at 556. Salomon's general counsel learned of the potential wrongdoing and notified upper management and the brokers' supervisor. *Id.* Management did not pursue the allegations, however, and federal authorities ultimately became involved when they discovered the bid-rigging. *Id.* The SEC and the Department of Justice fined Salomon and levied millions of dollars in penalties related to the scandal. *Id.* Salomon's shareholders filed a derivative case in late 1991, and this and other related federal cases were consolidated before Judge Robert Patterson of the Southern District of New York in Manhattan. *Id.*

[25] Section 5 sets forth a procedure in which the district court can appoint a substitute arbitrator upon motion of a party to an agreement, if there is a failure in appointing an arbitrator when "the agreement [provides] . . . for a method of naming or appointing an arbitrator or arbitrators or an umpire." 9 U.S.C. § 5.

case, and thus Judge Patterson retained his traditional authority to determine arbitrability. *Id.* at 557. They then argued that his referral of the matter to the NYSE was an implicit finding that the matter was arbitrable, and that he had the duty to name a substitute arbitrator or arbitrators under Section 5 when the NYSE proved unwilling or unable to perform. *Id.*

The plaintiffs responded that Judge Patterson complied with *First Options* because the agreements did assign the power to determine arbitrability to the NYSE. *Id.* Alternatively, plaintiffs argued that defendants waived the "who decides arbitrability" question by moving for him to refer the matter to NYSE and not renewing the objection when the case returned to Judge Patterson. *Id.*

The Second Circuit found that it need not reach the *First Options* issue because the decisionmaker determination for arbitrability was moot when there was no forum available for arbitration under the parties' agreements in any case. *Id.* at 557–58 ("[W]e cannot compel a party to arbitrate a dispute before someone other than the NYSE when the party had agreed to arbitrate disputes only before the NYSE and the NYSE, in turn, exercising its discretion under its Constitution, has refused the use of its facilities to arbitrate the dispute in question.") (citing NYSE CONST. art. XI, § 3). Specifically, the court held that Judge Patterson properly declined to appoint a substitute arbitrator under Section 5 because the language of the arbitration agreements indicated that the parties had designated the NYSE as the exclusive arbitral forum and that designation was "central to the parties' agreement." *Id.* at 561 (internal quotation marks omitted) (citing *Nat'l Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 333–35 (5th Cir. 1987) ("Not only did NIOC [National Iranian Oil Company] choose Tehran as the site of any arbitration, but the contract also provides that Iranian law governs the interpretation and rendition of any arbitral awards . . . . The language of the contract thus makes self-evident the importance of Iranian law and Iranian institutions to NIOC.")). The Second Circuit cautioned district courts to resolve who determines

arbitrability initially before referring the overall dispute to arbitration. *Id.* However, because the NYSE was the exclusive arbitral forum designated by the parties, the court found that "we will not disturb Judge Patterson's decision to proceed to trial." *Id.* In essence, the Second Circuit found that the identification of the arbitrability decisionmaker is moot if the named arbitral forum is essential to the parties' agreement and refuses to hear the dispute. *Id.*

In *Ranzy v. Tijerina*, the Fifth Circuit addressed a similar issue as the Second Circuit in *Salomon*, specifically whether, and if so, when, the district court may compel arbitration in a substitute forum after the designated arbitral forum becomes unavailable. *Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010). Cheryl Ranzy had agreed to arbitrate her disputes with defendant Extra Cash of Texas in a contract stating that disputes "shall" be resolved by the National Arbitration Forum ("NAF") pursuant to its rules and procedures. *Id.* at 175. When the dispute arose, however, the NAF was no longer available because it stopped hearing those types of consumer claims. *Id.* The district court denied the defendants' motion to compel arbitration, finding that it lacked the power to appoint a substitute arbitrator when the arbitral forum was chosen with "mandatory, not permissive" language. *Id.* The Fifth Circuit agreed with the district court, holding that a court need not compel arbitration to a substitute forum when the parties' agreement sets forth an "exclusive forum for arbitrating disputes" and that forum becomes unavailable. *Id.* at 176 (agreeing with the Second Circuit's holding in *Salomon*, which the court described as "indistinguishable" from the case at bar).

While *Salomon* and *Ranzy* address the court's power to compel arbitration when the designated forum is unavailable, several courts have held that a material departure from the appointment procedure in the contract warrants vacatur under Section 10 and bars enforcement of the arbitral award. *See Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 672–73 (5th Cir. 2002); *see also R.J.*

*O'Brien & Assocs., Inc. v. Pipkin*, 64 F.3d 257, 263 (7th Cir. 1995) ("[I]n order to enforce an arbitration award, the arbitrator must be chosen in conformance with the procedure specified in the parties' agreement to arbitrate."); *Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223, 226 (4th Cir. 1994); *Avis Rent A Car Sys., Inc. v. Garage Emps. Union*, 791 F.2d 22, 25 (2d Cir. 1986) (holding that an arbitrator who interpreted two agreements with conflicting appointment clauses was without jurisdiction to construe the agreement precluding his appointment).

In *Avis*, a pay dispute between Avis Rent A Car System, Inc. ("Avis") and one of its unions arose when the parties could not agree as to which agreement controlled the issue of wages, as between the "Association Agreement" and the "Avis Agreement." *Avis*, 791 F.2d at 23. The union sought arbitration under the procedures of the Association Agreement, which permitted arbitration under certain circumstances before the New York State Board of Mediation (the "Mediation Board"). *Id.* at 23–24. Avis contended that the dispute should be resolved pursuant to the procedures in the Avis Agreement, which specified that the parties' unresolvable issues under the grievance procedures "'shall be submitted to the American Arbitration Association under its rules of procedure.'" *Id.* (quoting Section 3 of the Avis Agreement). Over Avis's objection, the Mediation Board appointed an arbitrator under the authority of the Association Agreement, which permitted its involvement, rather than pursuant to the Avis Agreement, which did not. *Id.* at 24. Nevertheless, with both agreements before him, the arbitrator subsequently issued an award that set the ultimate rates of pay based on an implicit construction of the Avis Agreement. *Id.* Avis then moved to vacate the award on grounds that the arbitrator exceeded his powers because he was without jurisdiction to construe the Avis Agreement. *Id.* The district court confirmed the award, finding that although the arbitrator's appointment did not conform to the Avis Agreement's procedures for AAA

arbitration, the parties "received the essence of their bargain" and were not prejudiced by the Mediation Board's involvement.  *Id.*

The Second Circuit reversed the district court's order and vacated the award.  *Id.* at 24–26. The court held that because the arbitrator's appointment was inconsistent with the Avis Agreement, he had no power to construe that agreement.  *Id.* at 25.  The *Avis* court specifically found as follows:

> [The district court's opinion] fails to acknowledge that arbitration depends on the consent of the parties to the contract.  Under Article XX of the Avis Agreement, the Union and Avis agreed to binding arbitration only by a person selected under AAA rules.  Courts generally enforce such clauses strictly, vacating awards entered by arbitrators whose qualifications or method of appointment fail to conform to arbitration clauses.

*Id.*  Because the Mediation Board, and not the AAA, selected an arbitrator based on criteria not contemplated by the Avis Agreement, the Second Circuit reversed and remanded with instructions to the district court to "order the parties to place their dispute before an arbitrator selected under AAA procedures."  *Id.* at 26.

In sum, *Salomon* and *Ranzy* hold that a district court may decide certain threshold matters regarding the particular forum where arbitrable disputes—including arbitrability if the parties clearly and unmistakably delegate that question—may be heard.  *Ranzy*, 393 F. App'x at 176 (affirming the district court's denial of a motion to compel when the chosen, and essential, arbitral forum became unavailable); *Salomon*, 68 F.3d at 561 (holding that the court's failure to determine who decides arbitrability was immaterial when the mandatory forum for any alternative dispute resolution was unavailable, leaving judicial resolution as the only available option for the parties' dispute). Moreover, when an arbitration has already occurred, and an aggrieved party moves to vacate under Section 10, *Brook*, *Delta Queen*, and *Avis* hold that a court must vacate the award when the arbitrator lacks the jurisdiction to arbitrate the dispute because he was not the prescribed decisionmaker or is otherwise appointed in a manner materially deviating from mandatory selection

31

procedures.  *Brook*, 294 F.3d at 673–74 (holding that the AAA must follow the procedures for arbitrator selection but also finding that the losing party waived any error by failing to file a clear written objection to a defect in the selection process); *Delta Queen*, 889 F.2d at 603–04 (vacating an award because the arbitrator's finding of proper cause for termination "divested [him] of further jurisdiction over the matter.  Any subsequent disciplinary decision became the sole responsibility of [a different decisionmaker, the employer]"); *Avis*, 791 F.2d at 26 (precluding enforcement of an award if arbitrator's selection is a material departure from the method agreed to by the parties).

### 2.  <u>Application of Law to the Facts</u>

As a threshold matter, the court notes that its stay of confirmation proceedings was premised on deference to Judge Andrews's decision on the validity of the billing guidelines' arbitration agreement.  Dkt. 12 at 17–19.  Now that Judge Andrews has found that agreement to be valid, *see* Dkt. 44, Ex. 1 at 4–5, the stay of confirmation proceedings is **LIFTED**. And for purposes of this court's analysis on the motion to confirm, the court need not disturb Judge Andrews's decision and assumes, *arguendo*, that the guidelines' arbitration agreement permits arbitration of certain disputes.

Nevertheless, the court must consider three other arbitration provisions at issue in PoolRe's reinsurance agreements.  PoolRe purportedly asserted its arbitration rights and intervened in the first arbitration, filing claims for declaratory relief against the captives and asking that Ramos appoint an Anguilla-based arbitrator.  Dkt. 23, Ex. 17 at 24–25.  However, on April 29, 2013, instead of appointing another arbitrator, Ramos found that he had jurisdiction over PoolRe's claims and that PoolRe implicitly consented to arbitration in Houston by filing its intervention.  Dkt. 23, Ex. 13 at 1.  Ramos defended his assumption of jurisdiction in the award, stating that PoolRe was "properly joined" in the first arbitration "pursuant to its own arbitration agreements and ancillary to the otherwise pending arbitration."  Dkt. 6, Ex. 9 at 5 ¶ 5(iii).

The OSI entities move to vacate the award on grounds that PoolRe may not intervene in an arbitration initiated under agreements to which it was not a party. Dkt. 26-1 at 21. Further, the OSI entities argue that PoolRe's reinsurance agreements with the captives specified that arbitration of their disputes would proceed "under the auspices of the ICC" and under ICC rules, neither of which occurred. *Id.* at 21–22; Dkt. 33 at 17–18 & n.66 (explaining that Article 4 of the ICC Arbitration Rules requires a request for arbitration be submitted to the ICC's Secretariat, a procedure that was not followed); *see also* Dkt. 26-1, Ex. C to Ex. 2 at 2 (email from the OSI respondents' counsel in which he objects to Ramos's approval of an intervention over a dispute with agreements that require arbitration before the ICC and under ICC rules, not the AAA expedited rules). The Feldman entities argue that the court should defer to Ramos's jurisdictional findings because he was delegated the authority to decide arbitrability under the five contracts at issue. Dkt. 36 (PoolRe's response to the motion to vacate) at 13 (defending Ramos's exercise of jurisdiction and procedural application of the AAA expedited rules and stating that "[a]fter all, the right to arbitrate springs from consent") (citing *AT&T Techs.*, 475 U.S. at 648–49); Dkt. 47 (the Firm and Capstone's response to the motion to vacate) at 2–7 (incorporating PoolRe's objections to the motion to vacate and further contending that Ramos's jurisdictional rulings pursuant to the rules of both the AAA and ICC preclude judicial review).

First, as a matter of general principle, the court agrees with the Feldman entities that arbitration is a matter of consent and the parties to the reinsurance agreements agreed to delegate arbitrability disputes by contracting for arbitration before the ICC and under its rules. *Apollo*, 886 F.2d at 472–73. But the terms of that agreement expose the fundamental flaw in the Feldman entities' logic. For the court to accept the arbitrator's assumption of jurisdiction, that arbitrator must be the actual decisionmaker that the parties selected as an integral part of their agreement. *Salomon*,

33

68 F.3d at 560–61; *Delta Queen*, 889 F.2d at 603–04; *Ranzy*, 393 F. App'x at 176.  PoolRe and each captive did not consent to arbitration on the merits and threshold arbitrability matters before any arbitrator applying any procedural rules whatsoever; rather, they agreed that arbitration "*shall be submitted*" to the ICC under its rules of arbitration.  *See, e.g.*, Dkt. 6, Ex. 3 at 12 ¶ 3(A); *cf. Oxford Health*, 133 S. Ct. at 2068 (reiterating the longstanding rule that an arbitrator exceeds his powers when he acts "outside the scope of his contractually delegated authority") (internal quotation marks omitted).  The submission to the ICC did not occur, and the award clearly states that the proceedings were conducted under the AAA Commercial Arbitration Rules.  Dkt. 6, Ex. 9 at 2.  Further, PoolRe's intervention tainted the entire process and arbitration award because, among other things, the Feldman entities (collectively referred to by Ramos as the "Claimants") were awarded attorneys' fees, expenses, and costs in the amount of $451,244.44 "to be divided among themselves as they see fit," *id.* at 4 ¶ 3, including expenses incurred by "Claimants" in the Delaware case, even though PoolRe never appeared in any of the Delaware proceedings.  Dkt. 38 at 5 (PoolRe's categorical assertion that "[i]t is undisputed that PoolRe never appeared or participated as a party in [the Delaware] case—either in the state court proceeding or in the federal court action pending before the Honorable Richard G. Andrews").

In sum, consistent with *Salomon* and *Ranzy*, this court determines that the parties to the reinsurance agreements selected the ICC, and application of its rules, as a mandatory and essential condition of their agreement to arbitrate.  *Salomon*, 68 F.3d at 560–61; *Ranzy*, 393 F. App'x at 176. Ramos thus lacked jurisdiction to hear PoolRe's claims against the non-consenting captives and consolidate the claims into the first arbitration.  This assertion of power, over the OSI respondents' objection, warrants vacatur of the award.  *Brook*, 294 F.3d at 673; *Avis*, 791 F.2d at 25–26.

### 3.  Conclusion

Ramos lacked the authority to hear disputes among PoolRe and the three captives, and the arbitration award based on a fatally-flawed jurisdictional assertion cannot stand.  The Feldman entities amended motion to confirm is **DENIED**, and the OSI entities' motion to vacate is **GRANTED**.  The Feldman entities' motion for leave to extend page limits is **GRANTED**.  Lastly, because the court arrives at its decision without the need to consider the exhibits attached to the OSI entities' reply brief, the Feldman entities' motion to strike is **DENIED AS MOOT**.

### B.  *The Amended Motion to Compel*

The Feldman entities request that the court reconsider its previous denial of the motion to compel arbitration, contending that the court erred in failing to refer issues to Ramos that were plainly arbitrable under the relevant agreements.  Dkt. 23 at 16–22.  The court need not reconsider its July 29, 2013 order, however, because the live arbitration demand seeks to enforce relief arising from the claims asserted in the first arbitration.  Dkt. 23, Ex. 14 (the live demand) at 3–6.  The court's order vacating that award precludes the relief requested in the second arbitration.  For these reasons, the Feldman entities' amended motion to compel is **DENIED**.

Further, the denial of the amended motion to confirm and compel (Dkt. 23) also moots the request to add Integration, Systems, and Optimal as defendants in this case.  The Feldman entities' motions for leave to add the captives as additional defendants (Dkts. 20–21) is therefore **DENIED AS MOOT**.

### III.  CONCLUSION

The court is mindful that its review of arbitration awards is quite limited.  Underlying these limitations, however, is the recognition that agreements to arbitrate should be respected and their terms enforced.  Indeed, after the conclusion of an arbitration, the court cannot second guess the

arbitrator's jurisdiction and decision so long as "the arbitrator is even arguably construing or applying the contract *and* acting within the scope of his authority." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S. Ct. 364 (1987) (emphasis added) (*quoted in Oxford Health*, 133 S. Ct. at 2068). Although rare, this case presents an example of the second exception, in which an arbitrator assumed authority over a dispute that the parties' agreements mandated be referred to a different forum, namely the ICC. This error fundamentally prejudiced the proceedings, and pursuant to its authority under the FAA, the court may not sanction relief relating to the enforcement of the July 9, 2013 arbitral award.

For these reasons, the court adjudicates the remaining issues and motions as follows: (1) the stay of the confirmation proceedings is **LIFTED**; (2) the Feldman entities' amended motion to confirm and compel (Dkt. 23) is **DENIED**; (3) the OSI entities' motion to vacate (Dkt. 26-1) is **GRANTED**; (4) the Feldman entities' motion for leave to exceed page limits (Dkt. 22) is **GRANTED**; (5) the motions for leave to add new defendants (Dkts. 20–21) are **DENIED AS MOOT**; and (6) the Feldman entities' motion to strike (Dkt. 41) is **DENIED AS MOOT**.

Signed at Houston, Texas on March 31, 2014.

_____
Gray H. Miller
United States District Judge

36